State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

[No. 1662, August 26, 1914.]

STATE OF NEW MEXICO, on the relation of the Community Ditches or Acequias of TULAROSA TOWN-SITE, a corporation, RALPH S. CONNELL, THOMAS M. SHIELDS and SESARIO DURAN, Commissioners of said Corporation, and NOAH BULLARD, MAYORDOMO of said Corporation, Appellees, v. THE TULAROSA COMMUNITY DITCH, ELI KNIGHT, J. J. SANDERS, J. H. JACKSON and R. FIELDS, Appellants.

## SYLLABUS BY THE COURT.

1.   The Statute of Anne, (9 Anne, c 20 A. D. 1710) relating to informations in the nature of quo warranto, is a part of the common law, in force in this State.   Query, as to whether that statute applies to a proceeding, where the object sought is to oust individuals from the exercise of a corporate franchise, or against a corporation for usurping a franchise. Where, however, the parties treat the information as properly filed, on behalf of a private relator, the court will not EX MERO MOTU raise the question, but will consider the questions raised upon the assumption that the information was properly filed on behalf of a private relator.

P. 364.

2.   While under the Statute of Anne (9 Anne, c. 20 A. D. 1710) it was lawful for the proper officer of the court, with leave of the court, to exhibit an information in the nature of a quo warranto at the relation of any person or persons desiring to sue or prosecute the same, against any person or persons usurping, intruding into or unlawfully holding and executing certain offices and franchises, it was always held that the relator must have a special interest in the matter of inquiry, although a slight interest would obviate this objection.

P. 365

3.   The statutory law of the State, governing community acequias considered, and the construction placed upon such.

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

statutes in the case of Snow vs. Abalos, 140 Pac. 1044, followed. Held, further, that there can be but one community corporation for each acequia; that such corporation is created by statute; that it exists without action on the part of its members, but that it has only power to act, sue and be sued, where officers have been elected, to administer its affairs; and that the name of the corporation is of no importance. Held, further, that officers of such a corporation become such only by a strict compliance by the members of the community with the law, which provides for the election of such officers; that if pretended officers are elected in a way or manner, not authorized by law, such officers do not become dejure officers of the statutory corporation; that the right to vote for officers of such corporation is limited to those only who are entitled to and do apply water to a beneficial use, as members of such community corporation; that domestic use, separate from the use of water for other purpose, was not accorded a right to vote, neither was labor required for such use alone on the acequias; that the proportional vote of each member of such community depends upon the area of his irrigated lands, or his beneficial application of water.

P. 369

4. As it is only by the application of the water to a beneficial use that the perfected right to the use is acquired, it is evident that an appropriator can only acquire a perfected right to so much water as he applies to a beneficial use.

P. 370

5. Where a community ditch, as originally constructed carries water in excess of the requirements of the members of the community, new members may be admitted to the community in the method provided by statute, but it is not competent for the individual members of the community to sell a right to the use of such surplus waters.

P.371

6. Where an information in the nature of a quo warranto is filed on behalf of a pretended community corporation, as a private relator, against another pretended community cor-

poration, to oust the latter organization from the control of an acequia, and the information and proof shows that such relator is not the community corporation, created by statute, and authorized to administer the affairs of the community acequia, by reason of the non compliance with the statutory provisions for the election of officers, such relator is ·a non entity, without interest in the matter in controversy.

P. 373

7. Where, in 1862, the settlement of Tularosa was established, and 320 acres of land was laid out in lots and garden tracts, and a community ditch was constructed to carry water to the settlement, for the use of the various settlers, and such settlers and their successors irrigated lands not only within such original townsite, but also adjoining lands, such adjoining lands are entitled to water from such acequia, and the owners of the same are entitled to participate in the affairs of the community, on the same basis as the owners of town lots and garden tracts, within the unincorporated town.

P. 375

8. Act of January 31st, 1866, prohibiting the use of water above the mouth of the Tularosa Cañon construed. Held that such act only prevented the use of the water of the Tularosa River to irrigate lands "in the cañon from the source of the Tularosa River down to where said river enters the Tularosa Valley" and did not affect the use of water below such point.

P. 376

9. Held that the townsite patent, issued to the probate judge of Dona Ana County, under the Act of Congress of March 2, 1867, (Vol. 6 Fed. Stat. Ann. 334.) did not confer upon the residents of the townsite, any water rights, or alter the status of the residents of the townsite, as to the right to the use of water.

P. 376

10. The right of the residents of the town to the exclusive use of water cannot be maintained under the ·theory of "Pueblo Rights," as such rights only applied to lands, in cer-

JANUARY TERM, A. D. 1914    355

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

tain cases, granted by the Spanish or Mexican Governments, and, as the land in this case was settled long after the acquisition of the territory by the United States, and the grant was made by the latter, it would be subject to and controlled by the laws of the United States.

P. 376

11.  If a quo warranto be brought for usurping to be a corporation it should be brought against particular persons, because it is in disaffirmance of the corporation, and then judgment of ouster shall be given; but if it be brought for liberties claimed by a corporation, it must be brought against the corporation itself.

P. 379

Appeal from District Court, Otero County; Edward L. Medler, Presiding Judge. Reversed and Remanded.

T. B. CATRON, H. M. DOUGHERTY & H. H. MAJORS for appellants.

Under New Mexico statutes there can be only one corporation representing each community ditch.   Vol. 17, Enc. P. & P., 429; 117 Cal. 612; 88 Ill. 544; 5 Mass. 230; 1 Dougl. 59; 3 Minn. 240; 57 N. J. L. 203; 77 N. C. 18; 81 N. C. 301; 5 R. I. 1; 69 Tex. 369; 63 Tex. 265; 75 Tex. 231; Sec. 10, C. L. 1897.

Water rights in a community ditch may be sold and conveyed either with land to which appurtenant or separately and independent of land to which appurtenant. Farnham on Water Rights, Vol. 3, p. 204; 4 Wyo. 556; 21 Col. 188; 16 Col. 61; 66 Pac. 1074; 25 Col. 144; 8 Col. App. 234; 1 Weil on Water Rights, Secs. 541, 543; Sec. 537, 1 b., p. 573; Sec. 538 1b., p. 575; 150 Cal. 426; 4 Col. 382; Kinney on Irrigation, Sec. 994, p. 1760.

FRANK W. CLANCY, W. J. CONNELL, EDWIN MECHEM and RENEHAN & WRIGHT, for appellees.

Construction of Community Ditch. Act Jan. 31, 1866; Sec. 8, C. L. 1897; 13 N. M. pp. 162-3.

## OPINION.

ROBERTS, C. J.—In the year 1862, sixty-five men migrated from the town of Mesilla, Doña. Ana County, New Mexico, and the near by Indian Pueblo of Ysleta, to the present site of Tularosa, an unincorporated town, located in Otero County, this State. Upon their first arrival, they built rude dugouts, or CHOSAS, in a compact space, dug a deep trench surrounding the huts for the purpose of protecting themselves from the hostile Indians, and very soon thereafter took steps to lay out the present townsite of Tularosa. The town proper was laid out in the form of a square, consisting of forty-nine blocks, each block being divided into four lots, called solares. Outside this square additional blocks were surveyed and marked out, to the number of one hundred seven, each embracing approximately one and three-fourths acres which were denominated garden tracts, or HORTALIZAS. These solares and hortalizas were distributed to the original settlers, one lot and one garden tract, as a rule being allotted to each settler, and the remainder were reserved for future settlement. The Tularosa River, a typical mountain stream, emerged from a cañon some distance above the settlement. The settlers went up the cañon some three or four hundred yards and constructed a dam across the river and built a ditch to the settlement, for the purpose of obtaining water for domestic use, and to irrigate the lots and garden tracts. This ditch originally was very small, and capable of carrying only a limited amount of water, sufficient nevertheless to provide for the demands of the community, for domestic consumption and the irrigation of the lands cultivated. In the early Sixties the people cultivated only the lands within the townsite, or immediately adjoining, fear of the savage Mescalero Apache Indians causing them to remain close to the settlement for mutual protection. Later, however, lands further from the settlement were cultivated, on all sides of the town, and a witness for relator, Victoriano Duran, testified that when he went to Tularosa, in

1877, lands were being cultivated outside the town, in every direction. This cultivation of outside lands has constantly increased, until, at the time of the institution of this suit, there was approximately 1,700 acres watered from the ditches in question.

The ditches, conducting water to the community have been enlarged, from time to time, by the joint labors of all the water users, and have been extended many miles up the cañon in order to conserve the water and new springs have been opened up and old ones cleaned out, thereby materially increasing the supply of water.

Almost from the beginning the ditches were managed by commissioners and the water distributed by a mayordomo, as is now required by law, with this possible exception, however; instead of apportioning the waters to the members of the community, according to the land irrigated and the seed planted, each owner of a water right was given a twelve hours run of water. This run of water could be used by the party upon any land which he desired to irrigate.

These so called "water rights, or right to a specified run of water, were loaned, leased, and sold to others separate and apart from the land upon which they had been theretofore applied. Many owners of hortalizas sold their water rights and still retained the land. Other owners of hortalizas transferred the use of the water from the hortalizas to outside land. As the flow of water increased, the twelve hour run of water necessarily would irrigate an increased quantity of land.

Prior to the year 1893, the affairs of the community appear to have been very carelessly managed, and there arose many bitter disputes as to the right to the use of water. For instance, the owner of a hortaliza within the townsite would transfer his water right to some outside owner of land, who would irrigate farm land with the water right, and the hortaliza owner would still continue to demand and receive water. In the year 1893, the members of the community called a meeting of all the water users, and appointed a committee to determine who were entitled to receive water from the community acequia. This commit-

tee required all claimants of the right to use water to produce satisfactory evidence of such right, and a list was made of the so-called water right owners, which was recorded in the probate clerk's office of Doña Ana County. Thereafter water was apportioned only to water right owners whose names appeared upon this list.

In 1904 the name of the organization was changed to the "Tularosa Community Ditch" and an elaborate code of by-laws was adopted. The list of water right owners was revised, the number fixed at 106, to which one was thereafter added by order of the district court, making the total 107. These water rights, so fixed and recorded in the company's records, applied only to hortalizas and farm lands; no account being taken of the lot owners of the town, who were entitled to the use of the water. By the by-laws adopted, each owner of a so-called water right was permitted to vote at the community elections, being accorded one vote for each "water right," and all lot owners within the town were precluded from voting until, in the year 1909, the by-laws were so amended as to give each lot owner one-fourth of a vote per each lot. The owners of so-called water rights were required to perform a certain amount of labor upon the ditch, and likewise the lot owners were called upon for labor, the proportion being specified.

In the year 1866, (S. L. 1865-66, pages 138-140) the legislature of New Mexico passed an act, prohibiting the use of the waters of the Tularosa River, above the mouth of the cañon. The preamble and first section of the act which only are pertinent, read as follows:

"Whereas, A small number of men of Dona Ana County whose property was destroyed by the terrible floods of the Rio del Norte in the year 1862, and who, in consequence of their destitute condition, resolved to settle the Tularosa, which is now known as precinct number ten of said county, and,

Whereas, said inhabitants had to suffer great privations and overcome great obstacles at said place, thrown in their way by the Mescalero Apaches, who at said time were in

open hostility with the inhabitants of the territory of New Mexico; and

Whereas, Said settlers have had possession of said valley and rivers with which the lands thereof are irrigated, up to this time, and having chosen the most eligible place for their settlement: therefore,

Be it enacted by the Legislative Assembly of the Territory of New Mexico:

Sec. 1.    That no person shall have the right to use the water to irrigate lands in the cañon from the source of the Tularosa river down to where said river enters the Tularosa valley; provided, that mills and machinery may be established by any person who wishes to do so, under the condition that the course of the water shall not be changed so as to injure agriculture, this being a branch of the greatest necessity."

On September 23, 1873, in pursuance of the Act of Congress of March 2, 1867, (Vol. 6 Fed. Stat. Ann. pp 344) a townsite patent was issued to Pablo Melendres, Probate Judge of Doña Ana County, for 320 acres of land, embracing the larger portion of the original townsite, as laid out in the year 1862, by the original settlers.

In the year 1908, the major portion of the people residing within the limits of the townsite of Tularosa held a meeting and proceeded to and did elect three commissioners and a mayordomo, of an organization which they called the "Community Ditches or Acequias of Tularosa Townsite." These officials so elected, upon their qualifying as prescribed by law for community ditch officers,. demanded of the officers of the old organization the control of the ditches and distribution of the water, which was refused.    Thereupon injunction proceedings were instituted by the later organization, to prevent interference with said ditches and water by the officers of the Tularosa Community Ditch.    From an order dismissing the complaint, an appeal was taken to the Territorial Supreme Court, which court affirmed the judgment of the trial court. See Tularosa Ditch case, 16 N. M. 750.    The organization perfected by the residents of the town of Tularosa in 1908, was

maintained by the election of officers each suceeding year, and in January, 1912, the present suit was filed.

This is a proceeding in the nature of Quo Warranto, instituted in the name of the State, upon the relation of the Community Ditches or Acquias of Tularosa Townsite, an alleged corporation, against the Tularosa Community Ditch, Eli Knight, J. J. Sanders, J. H. Jackson, and R. Fields; the individuals named being, or claiming to be, the commissioners and mayordomo of the respondent corporation. The information proceeds upon the theory that the community ditch, and all waters carried by it, belong exclusively to the residents or owners of town lots and hortalizas within the 320 acre townsite of Tularosa; that no portion of the waters are appurtenant to lands without such townsite, and, no owner of land without the townsite, who uses water from the ditch is entitled to vote or have any voice in the management of the affairs of the community. Further, it is relator's contention, if we understand its theory, that it would not be competent for the owner of a hortaliza or lot within the townsite to convey or transfer a right to the use of water from within. the townsite to lands without its limits; that the original appropriation of the water was made by the community, as such, for the sole use and benefit of the townsite as originally laid out and platted, and the right to the water is vested in the community, within the original townsite, in which all the residents of the original townsite have a common interest and control, to the exclusion of all users of water from the community ditch without the townsite.

The information sets forth the Act of the legislature quoted supra, and also the townsite patent from the United States Government, but it is not clear whether the rights claimed by the people residing within the townsite are predicated upon either such legislative enactment or patent, or whether such claimed rights are what was known and termed under the Spanish-Mexican system of administering and disposing of public lands, "Pueblo Rights," which, under the "Plan of Pictic", was the right, invested in the inhabitants of the Pueblo, by the sovereign to enjoy the free use of the woods, water and other benefits from the

Royal and vacant lands lying outside of the tract assigned to the town, which right to the use of water, or the right of all the inhabitants in common within the jurisdiction of the pueblo, was superior to the rights of riparian proprietors, through whose fields the stream ran, and which right was a growing right, which could not legally be interfered with by a subsequent appropriator, and in which an outside user of water could not participate, or against which he could acquire no adverse rights.

The information also sets forth the by-laws adopted by the Commissioners of the Tularosa Community Acequia in the year 1904, by which the right to vote was limited to the holders of the 107 recorded water rights, which rights as stated, each represented twelve hours run of water in the main acequia; the exclusion of the lot owners from participation in the election, prior to 1910, and the amendment of the by-laws at that time so that each lot owner was given one-fourth vote each; the failure to furnish sufficient water to lot owners, and the total failure to furnish water, except in winter, to the owners of hortalizas, unless such owners were also the owners of one or more of the recorded water rights. The information also sets forth a decree rendered in a former suit between the Tularosa Community Ditch and the Tularosa Land and Cattle Company, which attempted to adjudicate the rights of certain individual water users under the Tularosa Community Ditch, or rather the rights of certain lands to the use of water, the owners of which, however, were not made parties to such suit. This decree need not be further referred to, because, insofar as it attempted to adjudicate individual rights to the use of water it would be a nullity, under the doctrine announced by this court in the case of Snow vs. Abalos, 140 Pac. 1044. 18 N. M. 681.

By relator it is further contended that the respondent, the so-called Tularosa Community Ditch, was organized in the sole interest and for the exclusive benefit of the so-called shareholders or water right owners, and that it was not therefore, a community organization, organized for the purpose of representing the community rights of the original settlers, their heirs and successors; that the so-

362     SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

called "water rights" claimed to be represented by them
were without legal or actual existence, of a speculative
origin, not having as a purpose the placing of the said
waters of the Tularosa River to beneficial use on any
specified land, but having their origin in and for the pur-
pose of disposing of surplus waters from year to year, and
in this manner having become a source of traffic without
regard to the origin of the same, or whether the supply
of water would meet future requirements of the owners of
such rights. The information concludes with the follow-
ing prayer:

"Wherefore, the said Attorney General for the said
State and in the name and by the authority thereof at the
relation of said Community Ditch or Acequias of Tula-
rosa Townsite. a corporation, Ralph S. Connell, Thomas
M. Shields and Sesario Duran, commissioners of said cor-
poration, and Noah Bullard, mayordomo of said corpora-
tion, prays the consideration of the court here in the premis-
es and due process against the said Tularosa Community
Ditch, Eli Knight, J. J. Sanders and J. H. Jackson, its
acting commissioners, and R. Fields, its acting mayor-
domo, requiring them to answer to the State of New Mex-
ico and to the said relators by what warrant they claim
to have, hold, use, exercise and enjoy the offices and fran-
chise aforesaid, and that said Eli Knight, J. J. Sanders
and J. H. Jackson, acting commissioners of said Tularosa
Community Ditch, and said R. Fields, its acting mayor-
domo, be declared not entitled to hold or exercise the of-
fices of commissioners or mayordomo of the ditches and
acequias of the community of Tularosa, as hereunto de-
scribed, but that they and each of them, and also any suc-
cessors to them, or either of them be ousted from said of-
fices and be ousted from the control and management of
said ditches and acequias or the water therein and that
said Ralph S. Connell, Thomas M. Shields and Sesario
Duran as commissioners, and Noah Bullard as mayordomo
be declared entitled to hold and exercise said offices and to
be installed therein as the only authorized officers of the
only lawful corporation now existing, to-wit, the 'Com-
munity Ditches or Acequias of Tularosa Townsite' as said

JANUARY TERM, A. D. 1914 363

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

Attorney General and said relators under the facts and the law must ever pray."

The Tularosa Community Ditch, as a corporation, voluntarily appeared, and filed an answer to the information. The answer so filed denied practically all the allegations set forth in the information, and set up the facts, as it claimed them to be. It is not necessary, in view of our conclusions, to set forth the fact pleaded in the answer. To the answer a general denial, by way of reply, was filed by the Relator. Upon the issues framed, the evidence was heard by the court. By stipulation of the parties finding of facts was waived by the parties. The trial court filed a written opinion in the case, which evidences an exhaustive research of the authorities, and also great learning and ability. Judgment was rendered in favor of the relator, ousting the respondents from the control and management of the community acequia, from which we quote the material portion, as follows:

"Wherefore, it is ordered, adjudged and decreed, that the said respondent, the Tularosa Community Ditch, is guilty of misusing the privileges of a public acequia or ditch corporation, and is guilty of malfeasance or nonfeasance in the management and control of the acequias or ditches known as the Tularosa Community Ditches or Acequias, and said respondent corporation, and the other respondents named in the information as officers thereof, are operating and controlling the said acequia or ditch to the exclusion of parties justly entitled to have and receive water therefrom under the laws of New Mexico, and in the interest of parties claiming to be the owners of 'water rights' solely, as set forth in said opinion, and such acts are ultra vires, and the exercise of the duties imposed upon said respondent corporation, as a public acequia or ditch corporation under the laws of the State of New Mexico are being perverted, and are exercised contrary to law.

And it is further ordered, adjudged and decreed, that the said respondent corporation, the Tularosa Community Ditch, and Eli Knight, J. J. Sanders, and J. H. Jackson, Commissioners, and R. Fields, acting mayordomo, named in the information as respondents, be and they hereby are

364     SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

ousted and removed from the control and management of the Tularosa community ditches and acequias, or the water therein, and from the exercise of the franchises and functions of a community acequia or ditch corporation under the laws of the State of New Mexico in and to the said Tularosa community ditches or acequias and the water flowing therein."

From this judgment respondent appeals, and by its assignment of errors sets forth eighteen grounds of error, upon which it relies for a reversal of this cause, only the first four of which need be considered. They are as follows:

"1.   The court erred in treating the alleged relator designated in the proceedings in said cause as the Community Ditches and Acequias of the Tularosa Townsite as a legitimate corporation.

2.   The Court erred in treating Ralph S. Connell, Thomas M. Shields and Sesario Duran, as commissioners, and Noah Bullard as mayordomo and officers of any legitimate corporation and in assuming they, or either of them, had been legally elected or qualified as such.

3.   The court erred in treating the said relators as having any legal status or standing in law to prosecute said information as relators thereof.

4.   The court erred in not holding that the appellant, Tularosa Community Ditch, is acknowledged and recognized by the relators in said cause as being a legal corporation and the other appellants as being officers of said legal corporation."

The first three assignments of error will be treated together as they all deal with the legal status of the relator, and its right to maintain the action. The Statute of Anne, (9 Anne, c. 20 A. D. 1710), (which is published in full as Appendix A in High's Extraordinary Legal Remedies) is a part of the common law, in force in this state, (Albright vs. Territory, 13 N. M. 64; Owen vs. Van Stone, 17 N. M. 41), and this information is filed by relator evidently on the assumption that that statute applies to a proceeding of this nature, where the object sought is to oust individuals from the exercise of a corporate franchise, or

against a corporation for usurping a franchise. There is grave doubt as to whether this statute has any application to this proceeding, (Rex vs. Carmarthen, 2 Burr. 869; King vs. Ogden, 10 B. & C. 230; Commonwealth, ex rel. McLaughlin vs. Cluley, 56 Pa. St. 270; Schenck vs. Cuttrell, 21 N. J. L. (Zab.) 1; Murphy vs. Farmers' Bank, etc., 20 Pa. St. 415; Com. vs. Lexington & .Harrodsburg Turnpike Road Co., 6 B. Monroe 397), but as the parties have treated the information as properly filed, on behalf of a private relator, we shall so consider it, and pass to a consideration of the questions raised, upon this assumption.

While under the statute of Anne it was lawful for the proper officers of the court, with leave of the court, to exhibit an information in the nature of a quo warranto, at the relation of any person or persons desiring to sue or prosecute the same against any person or persons usurping, intruding into or unlawfully holding and executing certain officers and franchises, it was always held, so far as we are aware, that the relator must have a special interest in the matter of inquiry, although a slight interest would obviate this objection. The King vs. Kemp, H. 29 G. 3, referred to in note to the King vs. Clarke, 1 East, 37, State vs. Vail, 53. Mo. 109, cited with approval by the Territorial Supreme Court in the case of Albright vs. Territory, 13 N. M. 64; 11 Am. & Eng. Ann. Cas. 1165:

"Even under a statute extending the remedy to 'any person or persons desiring to prosecute the same,' the question of the relator's interest will be deemed decisive as to the exercise of the jurisdiction, and the relief will be granted only in behalf of one whose interests are affected by the matter in controversy." High's Extraordinary Legal Remedies, Sec. 699.

"But the statute of 9th Anne allowed informations at the relation of any person desiring to sue or prosecute them and under that statute the rule was that a private relator must have an interest. Our act, which substantially incorporates the provision of the British statute, has received the same construction. This court has construed the words 'any person or persons desiring to prosecute the

366     SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

same' to mean any person who has an interest to be affected. They do not give a private relator the writ in a case of public right, involving no individual grievance." Commonwealth vs. Cluley, 56 Pa. St. 270.

The right of the relator to prosecute this information, depending, as it does, under the rule stated, upon its interest in the matter of inquiry, seemingly turns upon the question as to whether it is the corporation, created by statute and invested with the administrative control of the ditches and waters in question in this case. If it is not such corporate entity, it is not a corporation at all, for its only claim to be such is based upon its claimed compliance with the statutory provisions hereafter referred to. And it necessarily follows, that if it is not the corporation, created by statute, and invested with the power to administer the affairs of the community acequia, it could have no interest whatever in this information, and would not be a competent relator. The solution of this question depends upon the statutory law, of this State, governing community acequias, and the steps taken by the parties who claim to have followed such law, in giving corporate life to the relator.

The early legislation of the Territory affecting community acequias was reviewed, to some extent in the case of Snow vs. Abalos, 140 Pac. 1044, 18 N. M. 681, as was the origin of such acequias, and what was there said need not be repeated in this opinion.

In 1895 (Chap. 1, S. L. 1895) the territorial legislature enacted a law, in regard to community acequias, practically all the provisions of which are incorporated into the Compiled Laws of 1897. Some of these sections have been changed by subsequent amendment. Section 8, C. L. 1897, which was Section 1, of the Act referred to, as amended in 1903, (S. L. 1903, Chap. 98) reads as follows:

"All community ditches or acequias, now constructed or hereafter to be constructed in this territory, shall for the purposes of this act be considered as corporations or bodies corporate, with power to sue or to be sued as such. And every one of said community ditches beginning at the dam or entrance of the water in continued course to the end of the same, shall be considered as one ditch or acequia only,

to be superintended by three commissioners and one mayordomo as now provided by law, except that where two community ditches or more take water from a common ditch or head, they shall be and remain separate and under separate management."

Sections 9, 10, 11, 14 and 21, C. L. 1897, read as follows:

"Sec. 9.The officers of such community ditches or acequias shall consist of three commissioners and one mayordomo, or superintendent, each of whom shall be the owner of an interest in said ditch or the water therein; said officers shall be elected annually on the first Monday of December, and shall assume the duties of their office not later than the first Monday of the following January. On or before the first Monday of January, as aforesaid, said commissioners shall organize, by election of one of their number as chairman, another as secretary and another as treasurer. The treasurer shall be required to give a bond to the territory in a sum to be fixed by the commissioners. The mayordomo shall also be required to give a bond to the territory in a sum to be fixed by said commissioners. The condition of said bonds to be for the accounting of all moneys coming into their hands by virtue of their offices and for the faithful performance of their respective duties. In the event of a vacancy in the office of mayordomo, the commissioners shall have power to appoint a mayordomo or superintendent, to hold office until his successor is elected and qualified, as hereinbefore provided."

"Sec. 10. The election for acequia or community ditch officers under this act shall be held by the outgoing commissioners under rules and regulations to be prescribed by them. Only those having water rights in the acequia or ditch, shall be allowed a vote; but votes may be cast by written proxy and shall be in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights, PROVIDED, that the owners of any community ditch, which is not now under the direction of commissioners, shall select persons (not more than three) to hold the first election under the provisions hereof."

"Sec. 11.   The commissioners shall assess fatigue work or tasks of all parties owning water rights in said community ditches or acequias, and shall have general charge and control of all affairs pertaining to the same, together with the power to receive money in lieu of said fatigue or task work at a price to be fixed by them.   The mayordomo or superintendent shall, under the direction of said commissioners, be the executive officer of said ditch and have the superintendence of all work thereon and the distribution of the waters thereof, with the collection of fines, if any, and of amounts to be paid in lieu of fatigue or task work, and shall perform such other duties in connection with said ditch as may be prescribed by the rules and regulations of the same or as may be directed by the commissioners."

"Sec. 14.   The provisions of this act shall apply only to such ditches as have been heretofore and are now known and regarded as community ditches, under the laws of this territory; and under the provisions of this act, shall be construed to mean such ditches as are not private, and such as are not incorporated under the laws of this territory or of some other state or territory, and are held and owned by more than two owners as tenants in common, or joint tenants."

"Sec. 21.   All acequias, public or private, when completed, shall be the property of the persons who may have completed such acequias or ditches, and no person or persons who may desire to use the waters of such acequias or ditches shall be allowed so to do without the consent of a majority of the owners of such acequias or ditches, and upon payment of a share proportionate to the primary cost of such acequia or ditch to the amount of the land proposed to be irrigated, or the quantity of water proposed to be used; PROVIDED, That the provisions of this section shall not apply to any acequias or ditches, public or private, that may pass from the limits of any one county to within the lines of any other county."

Section 8, as amended, quoted supra, makes each community acequia a corporation, and gives to it, as such corporation, the power to sue and be sued as such.   The cor-

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352 ,

poration is created by the law, and every community ace-
quia which was in existence at the time this act was ap-
proved, without any act on the part of the persons using
water from such acequia, or any other agency, became a
corporation, for the purposes of that act, which was for the
purpose of administration only.   Snow vs. Abalos, supra.
And every community acequia since constructed would of
course likewise be a corporation.   ·The act in question,
having made all such community acequias corporations,
  without initiative or action on the part of the members
thereof, it is clear, that wherever there is a community
acequia, it is a corporation, and there can be but one cor-
poration for one ditch "beginning at the dam or entrance
of the water in continued course to the end of the same."
By failure of the members of the community corporation
to elect officers, in accordance with other provisions of the
statute, such corporation would be without power to act,
or to sue or be sued, because it is elementary that a cor-
poration can act only through its officers and agents; how-
ever this may be, the corporation would be in existence, by
virtue of the statute, and would possess vitality, as such,
upon the election and qualification of proper officers,
through which it could act, sue or be sued.   The name of
the corporation is of no importance, as we view it, hence,
the fact that the commissioners of the respondent corpora-
tion changed its name in 1904, is of no consequence.

   If what we have said above is true, it necessarily follows
that officers of such a corporation, become such only by a
   strict compliance by the members of the community
**3** with the law, which provides for the election of such of·
   ficers.  If such pretended officers are elected in a way or
manner, not authorized by law, it necessarily follows that
they would not become or be de jure officers of the statu-
tory corporation.   Section 10, C. L. 1897, quoted supra,
provides for the election of officers of such corporation.
This section, it is true, is somewhat ambiguous, by reason
of the use of the language "Only those having water rights
in the acequia or ditch, shall be allowed to vote; but votes
may be cast by written proxy and shall be in proportion to
the interest of the voter in the ditch or water, or in pro-

portion to the number or amount of his water rights"; but when we consider the right which the member of such a communiy acequia acquires to the use of water, it is apparent that the right to vote is limited to those only who are entitled to and do apply water to a beneficial use, as members of such community corporation, for it is only by the application to beneficial use, that a right to the use of water, or "water right" as the term is used in the statute, can be acquired. Under all the community acequias in this state, so far as we are aware, every domestic user of water also uses water for the irrigation of land, or some other purpose, such as the operation of a mill, or for mining purposes. The domestic use is so small, when compared to the other use to which water is applied by the appropriator, that the legislature possibly did not take such use into consideration in regulating the right to vote, or the labor to be performed upon the ditches (Sec. 35, C. L. 1897). There are 196 lots in the town of Tularosa. It is conceded by both parties to this litigation, that each town lot has a right to the use of water for irrigation and domestic purposes. The domestic, as well as the irrigation, right is appurtenant to the lot, and of course passes with the lot to the purchaser or lessee. Consequently, every person who owns a lot, or the holder of his proxy, is entitled to vote for the election of community ditch officers. His proportional vote is dependent upon the area of his lot, in comparison with all the other lands irrigated, or, using the statutory language "in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights." His interest in the ditch depends upon the amount of land for which he has acquired a water right, and this right, so acquired by him, is only to the use of a sufficient amount of water to properly irrigate his land and for domestic purposes. If one second foot of water will irrigate his land, he has a "water right" or a right to use only that amount and such additoinal quantity as may be required for domestic use, and he would be entitled to a proportional vote as this second foot of water bore to the whole amount appropriated. For example, suppose there are ten members of a community ace-

· JANUARY TERM, A. D. 1914 · 371

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

quia, each irrigating seventy acres of land; if one second foot of water is sufficient to irrigate each seventy acre tract, each member of such community would acquire a "water right", or a right to the use of one second foot of water, and, under the statute such individual member would be entitled to cast one-tenth of the total vote. As it is only by the application of the water to a beneficial use that the perfected right to the use is acquired, it is evident, that an appropriator can only acquire a perfected right to so much water as he applies to a beneficial use. For instance, suppose a member of such a community corporation, owns forty acres of land, which he intends to irrigate. He joins with others in constructing a ditch, which we will suppose carries water far in excess of the present and expectant requirements of the then members of the community. If one half second foot of water will irrigate the forty acre tract of the member, he only acquires a right to so much water, and the surplus water which the ditch may carry is subject to appropriation by others. Such additional appropriators can only become members of the community, with the consent of the majority of the owners of the ditch, but such surplus water could be appropriated from the stream by other appropriators, as the community ditch would only be entitled to take from the stream sufficient water to supply the requirements of its members. We do not desire to be understood, however, as holding that the limit of the individual member's appropriation would be measured by the amount of land he was irrigating in any given year, for such would not be so. The appropriator would be entitled to increase, from year to year, his use of the water, provided such enlarged use was originally claimed at the time of initiating the appropriation, and the intending appropriator proceeded with reasonable diligence to apply the water to the use intended. But where such appropriator, for illustration, only originally intended to irrigate forty acres of land, and he applied water on such land, this forty acres would be the limit of his right as such appropriator under his original appropriation. If the ditch carried double the amount of water claimed by the original appropriators, or

372     SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

which they intended to use, such surplus waters could not be divided into water rights and parcelled out to the members, to be held by them for the purpose of sale or speculation. Nor could such "surplus rights" be sold, and the purchaser thereof become a member of the community corporation. The only method by which new members may be admitted is pointed out by the statute. The present members, who claim to hold such rights, would have no right to vote such rights at elections. The member's right to vote would be limited to such proportional amount of the water as he was applying to a beneficial use, or for which he had a subsisting, valid and completed appropriation.

What we have said on this subject is probably not necessary to a decision of the points involved in this appeal, but a controversy has waged between town lot owners and so-called "water right" owners under this acequia for years, and it is perhaps advisable to set forth clearly the views of the court, for the future guidance of this community, and in aid of a proper future determination of the rights of the individual members composing the same. The record shows that the waters of this acequia have been divided into shares, based on a given number of hours run of water, without any regard being had to the acreage irrigated or the requirements of the individual consumer. These rights have been parcelled out and sold, and voted at all elections, regardless of the amount of land being irrigated, or upon which said waters have been applied. For illustration, the holder or owner of one of these so-called water rights would irrigate forty acres of land. A twelve hours run of water would more than supply his demand for this tract. He would sell one-half of this run of water to some other land owner, and still continue to irrigate the same forty acre tract he had theretofore watered. The purchaser would apply this water on new land, not theretofore irrigated, vote at elections and be treated as a member of the community, without any contribution toward the original cost of the ditch, or the consent of the majority of the water users. This procedure was not authorized by law, for clearly the owner of the forty acre tract would

have only the right to so much water as he had applied to a beneficial, economical use, and if a six hours run of water would irrigate his forty acre tract, such would be the limit and extent of his right. We do not mean to say that he could not sell the water right, appurtenant to his forty acre tract, if he so desired, to some other land owner under the community acequia, if no one was injured by reason of the change of place of use, but that he could sell surplus water, not required for the irrigation of the forty acre tract, or vote such surplus water at elections, introduces a new principle into the law of community acequias, which the law does not warrant. While this is true, yet it may be that the members of this community acequia would be estopped, by reason of their assent to the course and method pursued by the holders of these so-called "water rights", in permitting, without objection, the transfer of such fictitious rights, and thereafter treating the purchaser thereof as a member of the community acequia, supplying him with water, calling upon him for contributions of labor and money and permitting him to vote at elections. These considerations, however, do not enter into this case, but will be proper for the court to consider when called upon to adjudicate the rights of the individual members of this community.

Reverting now to a consideration of the question, as to whether the relator is the corporation, created by statute, and charged with the administration of the affairs of this community, with power to sue and be sued. As stated, **6** this depends entirely upon whether its officers were elected, in conformity with the statute, for if not so elected, they are not authorized to represent the corporate entity created by section 18, supra, and their pretended corporation under its assumed corporate name, would be a non-entity, without interest in the controversy, or the power to sue or be sued. Its officers would not even be de facto officers of the real corporation, for at the time of their election, officers, either de jure or de facto, were assuming to act for the statutory entity, and were in charge of the ditches and affairs of the corporation.

At all elections held by the organizers and officers of re-

lator, including the election in 1911, at which the officers managing its affairs in 1912, at the time this information was filed, were elected, the right to vote was limited to the residents of the original townsite of Tularosa, to the exclusion of every water user irrigating land without such townsite from the acequia. Each resident was given one vote whether he owned a lot or a dozen lots. This is shown by the testimony of Irby L. Fairless, from which we quote:

"Q.   Now these people you allowed to vote or was allowed to vote at that election, how did they vote each one as whole vote, or how was the amount?

A.   Each had a whole vote.

Q.   Without referring to the amount of water they had?

A.   No, land they had.

Q.   According to the land and the water?

A.   No, sir.

Q.   Nothing was taken into consideration at that election with reference to the amount of water?

A.   No, sir, if they had a piece of land they were considered legal voters.

Q.   If a person only owned a solare, one fourth of a block, he had one vote?

A.   Yes, sir.

Q.   And if he owned eight or ten or five or six solares or hortalizas he had one vote?

A.   That is all.

Q.   That is the way they looked at it?

A.   Yes, sir.

Q.   And if a person had the land and didn't irrigate it, he still voted did he?

A.   Yes, sir.

Q.   Any number of them did that?

A.   No, not many of them that are not irrigated.

Q.   Answer my question, was there any number?

A.   A few."

That the right to vote was limited to residents and owners of lots and hortalizas within the original townsite is shown by the following extract from the report of the election officers to the commissioners of relator.

"Clerk was asked if only owners of solares or hortalizas

in the pueblo in accordance with the instructions of the commissioners passed in their meeting of November 6th, 1911, were permitted to vote by the judges, to which Judge Fairless replied in the affirmative."

Even if it be conceded that only owners of solares and hortalizas were members of the community corporation it is plain that the election was not conducted in accordance with law, for the votes cast were not in proportion to the interest of the voter in the ditch or water.

But were only solar and hortaliza owners members of this community corporation? Clearly every solar owner was, and respondents so concede. Every hortaliza owner, who had acquired a perfected right to the use of water, or who had not lost his right by delaying an unreasonable time in applying water to a beneficial use thereon, and who had not transferred his right to other land or sold such right to others, who had so transferred it, was likewise a member, and entitled to vote the proportional interest represented by such hortaliza in the ditch and water. But the owners of outside land, which was being watered from such acequia, were also members of such community and entitled to vote, in the statutory proportion, if their rights were legally acquired therein, or were legally held at the time of election. Land within the 320 acre townsite had no preferential, superior or exclusive right over outside land. Of course, if the original constructors of the ditch only watered land within the townsite, and such rights so acquired were never transferred, and no other members had been admitted into the community system, it would be true that only lands within such townsite would be allowed to vote. But it appears from the record, that shortly after the ditch was constructed some of the original constructors were utilizing waters on outside land, and in the early seventies, one witness for relator testified that outside lands on all sides of the town were being cultivated and watered from the ditch. In 1906, probably 1,000 acres of outside land was being cultivated, and relator has failed to introduce any proof whatever tending to show that such lands were not legally entitled to water from the acequia, by reason of the transfer

376    SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches v. Tularosa Com. Ditch, 19 N. M. 352

of water rights, or the admission of the owners of such lands as members of the corporation in the statutory mode.

If relator has proceeded upon the theory that the water rights belong exclusively to the lands and lots within the town, because of the legislative enactment, quoted 8 supra, it is in error. This Act only prevented the use of the water to irrigate lands "in the cañon from the source of the Tularosa River down to where said river enters the Tularosa Valley", and all the land in question is below where such river enters the Tularosa Valley. The legislature did not attempt to regulate the use of water below the mouth of the cañon, or prevent the community from admitting new members, or enlarging the use of water or extending such use to outside land, on an equal basis with its use on lands within the townsite.

Nor did the townsite patent from the United States have any effect upon the water rights of the people inside the town, or, outside its limits. This townsite patent was issued by the officers of the general land office, under 9 authority of a general act of congress, applicable to all lands granted for townsite purposes. Such congressional enactment did not attempt to confer upon the residents of such town any water rights, exclusive or otherwise, or to invest such rights in the trustee, which in this case was the probate judge of Doña Aña County. It was a mere naked grant of land, to such trustee, for the use and benefit of the inhabitants, present and prospective, of such townsite. Such trustee, under local legislative authority, administered such trust, and conveyed the lands to those entitled to the same. The rights of lot and garden tract owners to water stood upon the same basis exactly, as if no such townsite patent had ever issued, and the land had been acquired in some other mode.

Nor can such exclusive right be sustained, under what was known under the Spanish and Mexican laws and 10 customs as a "Pueblo Right", the origin, nature and character of which will be found fully discussed by Kinney on Irrigation and Water Rights, (2nd Ed.) Sec. 581 et seq. The author says:

"At first the plan for the establishment of these pueb-

los was for the King of Spain, in each case by special ordinance, to provide for the foundation of the pueblo, and to set apart for the use of the pueblo and its inhabitants a certain area of land, and to prescribe in the ordinance the rights of the pueblo and its inhabitants to the use of the waters flowing to those lands. Later, upon the establishment of the pueblo of Pictic in the State of Sonora, sixteen square leagues of land were thus set apart for the use of the pueblo and its inhabitants, and it was further provided:

'7th. The neighbors and natives shall likewise enjoy the use of the woods, water, and other benefits from the royal and vacant lands lying outside of the tract assigned to the new town, jointly with the residents and natives of the immediate and adjoining towns; which favor and right shall continue until by His Majesty the same shall be granted or alienated; in which case regulations will be made according to the provisions for concessions in favor of new possessors or proprietors.'

And, further, it was also at this time provided by the King, by general ordinance, that thereafterward the provisions and rights granted and the general plan followed in the foundation of the pueblo of Pictic should be followed in the foundation of any new pueblos in the jurisdiction of the commanding general of the internal Provinces of the West, of which California, Arizona, New Mexico, and Texas constituted a part. This scheme for the foundation of the pueblos we will designate as the 'Plan of Pictic'. Relative to its right to waters under the Mexican law a pueblo, as a quasi corporation, had the power to distribute to the common lands and to its inhabitants the waters of a non-navigable stream on which the pueblo was situated. And our Courts have determined that the cities and towns in this portion of the country, where they were the successors of these pueblos, held the pueblo lands and waters in trust for the inhabitants, and that the legislatures of the respective States and Territories, as successors to the Mexican Government, can control the execution of this trust. And this pueblo right to the use of water, or the right of all the inhabitants in common within the jur-

378    SUPREME COURT OF NEW MEXICO

State ex. rel. Com. Ditches y. Tularosa Com. Ditch, 19 N. M. 352

isdiction of the pueblo, was superior to the individual rights of appropriators, and also superior to the rights of the riparian proprietors, through whose fields the stream ran."

Whether the "Plan of Pictic" applied to that portion of Mexico, of which this state was a part, is wholly immaterial, for this townsite grant was made by officers of the United States Government, under authority of an act of congress, long after New Mexico became a part of the United States, and of course would be subject to and controlled by the laws of the granting sovereign. Whatever might have been the rights of the people of this settlement, had the land been acquired from the Mexican Government by grant, or otherwise, is of no consequence. The land having been acquired from the United States, after it passed under its jurisdiction and control, the grant would carry with it only such rights and privileges as were accorded by the laws of the United States.

This acequia is recognized by the relator as a community acequia, and it is upon the statutory law governing such acequias that it bases its rights in this case. This being so, under Section 21, C. L. 1897, quoted supra, the acequia was the property of the persons who constructed the same, and they had the power to admit new members into the community, with the right to take water therefrom to irrigate their lands. Every water user, as stated, legally entitled to take water from this acequia for the irrigation of his lands, is a member of the community corporation, regardless of whether his lands lie within the 320 acre townsite or not, and, under Sec. 10, C. L. 1897, quoted supra, he is entitled to vote and participate in the affairs of the community corporation. The trial judge reached the same conclusion, for he said, in his opinion:

"That such control and management is not limited solely to the residents of the Tularosa townsite of 320 acres, but all persons owning lands under such ditch, using water therefrom, and whose grantors in title originally built such ditch, or contributed to its primary cost, are entitled to take part in the management and control of the public acequia or ditch."

The parties who attempted to perfect an organization under the name given the relator, having excluded all irrigated lands without the limits of the townsite from representation, and further having failed to comply with the provisions of Section 10, supra, as to those who were permitted to participate in the elections, have failed to give any power or life to the relator. It is not the corporation created by statute, and given the power to administer the affairs of the community. The officers elected in its name, are not the officers of the  statutory  corporation. They were not elected as required by law.  They have no power to represent the statutory entity. This being true, the relator herein is a non-entity, without the power to act,, and with no interest whatever in this litigation. It is in the same position substantially as the respondent, if it be true as charged, that respondent, and its officers and agents, denied the owners of town lot and hortalizas the right to vote. The relator, having no interest in the matters and things set out in the information, the same should have been dismissed.

The fourth assignment of errors proceeds upon the theory that, as the information was filed against the Tularosa Community Ditch, as a corporation, its corporate existence is admitted; and being so admitted, necessarily, the information failed to state facts sufficient to warrant a judgment of ouster. It is true four individuals are joined with the corporation as respondents, but it is clear from a prayer of the complaint, that such individuals were joined with the corporation respondent, as its commissioners and mayordomo. The Tularosa Community Ditch is the only answering respondent, and answers in its corporate capacity. The trial court treated the information as having been filed against the corporation, as such, as will be seen  by the  excerpt  heretofore  quoted from its judgment. The respondent, the Tularosa Community Ditch, was either the statutory corporation, entitled to control and manage the acequia in question, or it was no corporation at all. Relator does not contend that respondent was organized as a corporation, under any other law of the State, or, that it was a community cor-

poration, legally in charge of some other acequia, by virtue of which it would be a corporation, and that it was reaching over and assuming control of some other acequia, which it had no jurisdiction over or right to control. Its contention is that respondent is not a corporation, and, because it is not, necessarily the individuals named as respondents are not its officers and agents, and have no power to act for it. It does not seek to oust the owners and holders of the one hundred seven "water rights" from usurping to be a corporation, because the suit is not brought against them. The information is against the corporation which relator claims is not a corporation, and certain of its officials, as such, for the purpose of ousting it from the usurpation of a corporate franchise.

"It is well settled that a corporation cannot be sued as such, and brought into court, and the action maintained against it on the ground that it is not a corporation. If it is intended to draw in question the franchise of the corporation, the proceeding must be against the individuals who usurp the franchise. If it is claimed that the corporation is usurping privileges and powers not belonging to it, the corporation is the proper and only proper party." People vs. Stanford, 77 Cal. 360.

The foregoing statement of the rule, by the California Court, is in harmony with the decided weight of authority. Cases discussing the question are collected in an exhaustive note, appended to the case of Armstrong et al., vs. State ex rel Fain, Ann. Cas. 1913 A, 565. See also Thompson on Corporations, (2nd Ed. Sec. 5815.)

Spelling, in his work on Injunction and other Extraordinary Remedies, (2nd Ed.) Sec. 1843, says:

"The true rule was stated by the prosecution and recognized by the court in an early English case, where it was said, quoting from Lord Hale's common place book, 'that if a quo warranto be brought for usurping to be a corporation, it should be brought against particular persons, because it is in disaffirmance of the corporation, and then judgment of ouster shall be given; but if it be brought for liberties claimed by a corporation, it must be brought against the corporation itself' ".

In the next section (1844) the same author, in discussing the effect of filing an information containing two counts, one charging certain individual defendants with usurping corporate capacity, and another charging the corporation which was joined with them as a party defendant with exercising without legal authority the franchises appertaining to a street railway company, says.

"The court very properly decided that there was a misjoinder, although no question of misjoinder was made by counsel. By suing the corporation, its corporate existence was admitted, and no quality or quantity of allegation could do away with such admission; while the corporation in whose name the individual defendants were alleged to have done the acts complained of was retained upon the record as a party defendant, no judgment could be rendered against them, for the wrongs complained of were not done in an individual but in a corporate capacity."

This reasoning is directly applicable to this case, if it could be contended that the individual respondents were joined as individuals, and not as corporate officers, for the information clearly shows that all their acts and claimed powers, were done under and exercised by virtue of the offices which they held in the corporation. By joining the corporation, as respondent in the information, its existence is admitted, and relator cannot afterwards controvert its own admission.

The fourth assignment of error is, therefore, also well taken.

Were we not required to reverse this cause, because of the alleged errors discussed, it must be apparent that the judgment entered by the district court would not be decisive of the ultimate rights of the individuals who are members of this community corporation. The judgment ousts the respondent from the control and management of the acequias, and from the exercise of the franchise and functions of a community acequia or ditch corporation under the laws of New Mexico. Were this judgment to stand, it it evident that the officers of the pretended corporation, named as relator in this case, would attempt to enter into the control and management of the ditches and

waters flowing therein, and this, notwithstanding the fact that such officials have not been elected in conformity with law, and are not entitled to manage the affairs of the community. The result would probably lead to another information in the nature of Quo Warranto to oust them from such offices and the control and management of the acequia. Endless litigation would result without the accomplishment of any good for the community, or the adjustment of the ultimate rights of its individual members. The remedy which should be applied in this case, is the adjudication of the right to the use of water of each individual member of this community. When the individual rights are determined, in an appropriate action, such rights will be judicially adjudicated, and set at rest. Only those ascertained to have such rights will be permitted to vote at elections, and the proportional vote will be easily determined. Officers elected, by a majority vote, in accordance with the provisions of Section 10, will be entitled to manage the affairs of the community, and apportion the waters flowing in the ditch in accordance with the rights of each consumer. It is possible counsel for relator and the trial court were misled by what was said by the Territorial Supreme Court in the Tularosa Ditch Case, 16 N. M. 750. The court said.

"If the defendant, the Tularosa Community Ditch, is assuming to be a corporation, when, in fact, it is not one, or, if being one, it has usurped authority beyond its corporate powers, it is a matter of public concern and should be dealt with, not by a suit in equity, in which a decision would necessarily be limited to the cause itself, but in proceedings in the nature of quo warranto, which would determine the status of the defendant, once and for all."

Thereby implying, it might be argued, that the only available remedy was by information in the nature of quo warranto against the pretended corporation, even though in fact it was not one, rather than against the individuals who were usurping to be a corporation. No consideration, however, was given by the court, in that case, to the question of proper parties defendant in such a proceeding. The point there involved was, as to whether injunction

was the proper remedy to test the right of the defendant, to act as a corporation, or to exercise certain rights, and the court properly held that the remedy was by quo warranto and not in equity, and the question as to proper parties defendant was not involved. In that case, as in this, counsel for plaintiff there, and relator here, proceeded upon the theory that all the ditches and waters in question belonged exclusively to the people within the original townsite of Tularosa, in which no outside land owner had any interest, and could acquire none. Of course, were this assumption correct, the relator here might be the statutory corporation, and quo warranto proceedings would afford an adequate and complete remedy. But such theory, as we have stated, is untenable.

For the reasons stated, the judgment of the trial court will be reversed, and the cause remanded, with instructions to the district court to dismiss the information, and, IT IS SO ORDERED.