1998-NMSC-016

961 P.2d 153

**Dr. John N. WILSON, Barbara Wilson, and Nat Wilson, Contestants/Counterclaim–Defendants/Appellees,**

v.

**Jeanne DENVER, Margaret Nes, Polly Fox, Sue Goldberg, and Tony Trujillo, Contestees/Counterclaim–Plaintiffs/Appellants.**

No. 23667.

Supreme Court of New Mexico.

May 29, 1998.

Steven Sugarman, Santa Fe, for Appellants.

Miller, Stratvert & Torgerson, P.A., J. Scott Hall, Santa Fe, for Appellees.

Tom Udall, Attorney General, Alletta D. Belin, Assistant Attorney General, Santa Fe, for Amicus Curiae State of New Mexico.

Ted Apodaca, Jeffrey T. Pender, Santa Fe, for Amicus Curiae New Mexico State Engineer.

## OPINION

MINZNER, Justice.

{1} Contestants–Appellees Doctor John Wilson, Nat Wilson, and Barbara Wilson pursued this consolidated action contesting two separate elections of several individuals to the seats of commissioner and mayordomo for the El Rito de la Lama Acequia Association (the Association). The district court granted summary judgment in favor of the Wilsons, and we granted Contestees–Appellants' application for interlocutory appeal. We reverse the grant of summary judgment and remand for further proceedings.

## I.

{2} The acequia at issue in this matter is located in the community of Lama in Taos County. Several neighboring families built the acequia around 1900 and, in 1902, formed a ditch association. Subsequently, in 1908, the families filed articles of incorporation for the Association with the Territorial Engineer and collectively filed for seven cubic feet per second water rights on La Acequia de la Lama for the purpose of irrigating a combined area of 640 acres. The water rights in the acequia were adjudicated in 1963 and 1980. In conjunction with the 1980 adjudication of water rights, the Association entered into a stipulation in 1979. The stipulation converted three of the domestic water rights of nine acre feet to domestic water rights of 0.27 acre feet each. These domestic water rights were transferred to a number of separate households having no other source of domestic water and no pre-existing water rights in the acequia.

{3} Currently, the Association divides the water rights in the acequia into share/hours, with one share being the use of the full flow of the ditch for one hour per week. Of the 168 share/hours of water rights in the acequia, the Wilson family owns 102.5 share/

hours. Thus, the Wilson family possesses 61% of the original water rights in the acequia.

{4} In 1994, the Association held its annual meeting for the election of commissioners and a mayordomo. On the day before the meeting, John and Barbara Wilson sent a letter to the commissioners indicating an intent to vote in proportion to their share/hours of water rights. At the meeting, the Association refused to apportion 61% of the vote to the Wilson family. Instead, the Association decided to allow voting on a "one member, one vote" basis, and the election was conducted by a show of hands, including those members of the Association possessing only the domestic water rights appearing in the 1979 stipulation. The Association maintained that voting was in proportion to the common and equal interest of every member of the Association in the ditch.

{5} At the annual election in 1995, the Wilsons asserted a statutory right to vote in proportion to their water rights and cast their 61% vote for Barbara Wilson and John Wilson to be commissioners and for Nat Wilson to be mayordomo. The Wilsons abstained from voting for the third commissioner seat. Once again, the Association decided to conduct the election based on the vote of a majority of the water users. As a result, the Wilsons separately contested both the 1994 and 1995 elections as violative of their statutory voting rights and contrary to the law of New Mexico.

{6} In the district court, the Wilsons moved for summary judgment with respect to the 1994 election contest, contending that the election violated the acequia election procedure promulgated by the New Mexico Legislature. The district court granted the Wilsons' motion for summary judgment on the legal issue of whether the election violated applicable statutes. Recognizing a "substantial ground for difference of opinion," however, the district court, in certifying the matter for interlocutory appeal, asked "whether New Mexico statutes require acequia associations to elect their commissioners and mayordomos in elections where votes are distributed to eligible voters proportion-

ately according to shares of water rights owned by the members." Subsequently, the district court consolidated the two election contests.

{7} Following consolidation, the Court of Appeals denied as untimely an application for leave to file an interlocutory appeal by the Appellants, officers of the Association elected pursuant to the contested procedure (collectively, the Officers). The district court then granted a motion to issue a second interlocutory order, and this Court granted the Officers' application for interlocutory appeal. Although the Appellants originally filed their appeal with the Court of Appeals, their subsequent filing with this Court reflects the Legislature's direction that contests of ditch officer elections "shall be commenced and conducted as provided by law in the case of general elections for county officers," *see* NMSA 1978, § 73–3–3 (1903, as amended 1921), and the Legislature's provision of a direct appeal to this Court in the contest of a general election, *see* NMSA 1978, § 1–14–5 (1969).

## II.

{8} Prior to addressing the substantive issue certified for interlocutory appeal, we raise, sua sponte, the question whether the district court had subject matter jurisdiction over these election contests. *See Britt v. Phoenix Indem. Ins. Co.*, 120 N.M. 813, 815, 907 P.2d 994, 996 (1995) (raising jurisdiction of appellate court sua sponte); *Armijo v. Save 'N Gain*, 108 N.M. 281, 282, 771 P.2d 989, 990 (Ct.App.1989) ("A jurisdictional defect may not be waived and may be raised at any stage of the proceedings, even sua sponte by the appellate court."); *see also* Rule 12–216(B) NMRA 1998 (requirement of preservation of error for purposes of appeal inapplicable to jurisdictional questions); *cf.* Rule 1–012(H)(3) NMRA 1998 (providing for sua sponte dismissal by the district court for lack of subject matter jurisdiction).

■ {9} The question of whether the district court had subject matter jurisdiction arises from a statutory limitation on the right to file an election contest. The Legislature, in creating a statutory right to contest a ditch election, specifically provided a time limitation for the filing of an election contest: "[T]he notice of contest *shall be filed within fifteen days* after the result of the election is announced as herein required." Section 73–3–3 (emphasis added). While defenses based on statutes of limitation typically are waived if not raised in the pleadings, *Chavez v. Kitsch*, 70 N.M. 439, 442–43, 374 P.2d 497, 499 (1962); *see* Rule 1–008(C) NMRA 1998 (listing statute of limitations as an affirmative defense), our cases have indicated that time limitations contained in statutes which establish a "condition precedent to the right to maintain the action" are jurisdictional and not subject to waiver. *See, e.g., Garza v. W.A. Jourdan, Inc.*, 91 N.M. 268, 270, 572 P.2d 1276, 1278 (Ct.App.1977). This case requires us to consider such a statutory provision.

■ {10} "The right to contest an election is entirely statutory; such a proceeding was unknown at common law. The statutory provisions for an election contest must be strictly followed. One has the right to contest an election only in the manner and to the extent prescribed by statute." *Dinwiddie v. Board of County Comm'rs*, 103 N.M. 442, 445, 708 P.2d 1043, 1046 (1985) (citations omitted); *see Forbes v. Bell*, 816 S.W.2d 716, 718 (Tenn.1991) ("The proceedings in an election contest are said to be summary in nature, and the statutory prerequisites are considered jurisdictional."). Accordingly, we construe the fifteen-day filing limitation contained in Section 73–3–3 as a condition precedent to the exercise of jurisdiction by the district court. *See Eturriaga v. Valdez*, 109 N.M. 205, 209–10, 784 P.2d 24, 28–29 (1989) (concluding that a definite time period for commencement of an action, where created by the same statute creating a right to contest an election, "is a limitation on the substantive right the legislature has created"); *Forbes*, 816 S.W.2d at 718 ("[T]he court cannot review grounds for invalidating election results unless they have been filed within the statutory period, rules of practice in civil actions to the contrary notwithstanding.") (citation omitted); *cf. Citizens for Los Alamos, Inc. v. Incorporated County of Los Alamos*, 104 N.M. 571, 572–73, 725 P.2d 250, 251–52 (1986) (holding time limitation for appeals

from zoning authority a jurisdictional requirement).

{11} With respect to the first election challenged in this matter, the Wilsons failed to file a notice of election contest within the statutory mandate. From the face of the Wilsons' complaint, the Association held the election on April 24, 1994, and based the election on a show of hands from the attending members of the Association. Thus, the results of the election were announced on April 24. However, the Wilsons did not file their notice of contest in the district court until May 23, 1994, a total of twenty-nine days following the announcement of the election results, *see* NMSA 1978, § 12–2–2(G) (1973, repealed 1997) (directing that, "in computing time, the first day shall be excluded and the last included unless the last falls on Sunday"). Therefore, we conclude that the untimely filing of the notice of contest deprived the district court of jurisdiction to consider the matter. As a result, we must remand the 1994 election contest, No. 94–109 CV, to the district court for dismissal.

{12} With respect to the second election contest, we reach a different conclusion. In the second challenged election, the Association held an election at its annual meeting on May 7, 1995. The Wilsons filed a verified complaint for election contest on May 22, 1995, the fifteenth day following the announcement of the election results. Therefore, the notice of contest was timely, and we conclude that the district court has jurisdiction over the 1995 election contest, No. 95–138 CV. As a result, we now proceed to the substantive question certified for interlocutory appeal with respect to the 1995 election only.[1]

### III.

{13} Summary judgment is proper only if there are no genuine issues of materi-

al fact and the movant is entitled to judgment as a matter of law. *Gonzales v. Allstate Ins. Co.*, 1996–NMSC–041, 122 N.M. 137, 139, 921 P.2d 944, 946. In reviewing a grant of summary judgment, we resolve all inferences in favor of the party opposing summary judgment. *Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997–NMSC–042, ¶ 9, 123 N.M. 767, 945 P.2d 985. When summary judgment depends entirely on the interpretation of a statute, a question of law, *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995), we will review the trial court's construction of the statute de novo. *Krahling v. First Trust Nat'l Ass'n*, 1997–NMCA–082, ¶ 9, 123 N.M. 685, 944 P.2d 914, *cert. denied*, 123 N.M. 446, 942 P.2d 189 (1997).

{14} The Legislature has specifically provided a procedure for the election of acequia association officers in Taos County:

> The election for acequia or community ditch officers, under this article, shall, be held by the outgoing commissioners, under written rules and regulations to be prescribed by them. Only those having water rights in the acequia or ditch, and who are not delinquent in the payment of their assessments shall be allowed to vote ....
> All votes shall be in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights, which for election purposes, shall never exceed the lands under irrigation the outgoing year....

Section 73–3–3. The Wilsons contend that the phrase "in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights" prescribes a single method of voting for ditch associations. They contend that the Legislature, in enacting Section 73–3–3, pre-

---

1. We note that the dismissal of the 1994 election creates a procedural ambiguity. The Wilsons moved for summary judgment only in relation to the 1994 election. Further, the order granting summary judgment was entered in the 1994 election contest prior to its consolidation with the 1995 election contest. Nevertheless, the two election contests raise identical issues. In addition, the Wilsons filed an unopposed motion to consolidate prior to the entry of summary judg-

ment. In the order granting summary judgment, both the 1994 and 1995 election contests appear in the caption. Finally, both matters were certified for interlocutory appeal on the sole issue of the interpretation of the applicable statute. Therefore, we conclude that the district court intended to apply the grant of summary judgment to both the 1994 and 1995 election contest, and we will review the grant of summary judgment as it applies to the 1995 election contest.

scribed a method of proportional voting based only on water rights. As a result, the Wilsons contend that they should have been allowed to cast a 61% vote.

{15} The Officers offer a different construction of Section 73–3–3. The Officers claim that the Legislature's inclusion of the word "ditch" establishes an alternative method of voting, in addition to reliance on water rights, based, instead, on ditch ownership in the acequia. The Officers further claim that the ditch is owned by all water users as tenants in common and that there is a presumption of equal ownership which, in this case, should prevail. As a result, the Officers claim that it was permissible to conduct the election by a show of hands.

### A.

▮ {16} In construing a statute, we look first to "the plain language of the statute as the primary indicator of legislative intent," and we construe the words of a statute according to their ordinary meaning absent evidence of legislative intent to the contrary. *Whitely v. New Mexico State Personnel Bd.*, 115 N.M. 308, 311, 850 P.2d 1011, 1014 (1993). When appropriate, we will rely on rules of grammar to aid our construction of the plain language of a statute. *See State v. Clark*, 80 N.M. 340, 342, 455 P.2d 844, 846 (1969).

▮ {17} We believe Section 73–3–3 contains plain language and that its plain language, properly construed, should be understood to provide alternative methods of voting for ditch association officers. The statute provides: "All votes shall be in proportion to the interest of the voter in the ditch *or* water, *or* in proportion to the number or amount of his water rights . . . ." Section 73–3–3 (emphasis added). "As a rule of construction, the word 'or' should be given its normal disjunctive meaning unless the context of a statute demands otherwise." *Hale v. Basin Motor Co.*, 110 N.M. 314, 318, 795 P.2d 1006, 1010 (1990). Given the lack of a comma between the words "ditch" and "water" in Section 73–3–3, it appears that the Legislature intended a disjunctive meaning under which both words have independent

significance. In addition, the separation of the phrase "or in proportion to the number or amount of his water rights" by a comma indicates that its use is explanatory rather than alternative. Using the doctrine of the last antecedent, and avoiding an interpretation rendering statutory language surplusage, *see Katz v. New Mexico Dep't of Human Servs.*, 95 N.M. 530, 534, 624 P.2d 39, 43 (1981), we believe that the phrase "or in proportion to the number or amount of his water rights" explains the meaning of the interest in "water" and that the Legislature did not intend to use the phrase as a definition of the interest in the "ditch." *See Caseldine v. Johnson (In re Goldsworthy's Estate)*, 45 N.M. 406, 412, 115 P.2d 627, 631 (1941) ("[R]elative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote.") (citation and internal quotation marks omitted). Therefore, we conclude that the statute plainly recognizes alternative methods of voting for ditch officers and, specifically, provides that voting shall be in proportion to the interest in the ditch or in proportion to the interest in the water flowing through the ditch, the latter of which is defined by water rights.

### B.

{18} The State Engineer, as amicus curiae, contends that the statute is ambiguous and that the reference to the interest in the ditch, the interest in water, and the number or amount of water rights is an enumeration of things similar in kind. As a result, the State Engineer urges us to interpret Section 73–3–3 as requiring voting in proportion to water rights. *See State ex rel. Dep't of Pub. Safety v. One 1990 Chevrolet Pickup*, 115 N.M. 644, 648, 857 P.2d 44, 48 (Ct.App.1993) ("Where the context requires that a qualifying word or phrase apply to several preceding phrases, the qualifying word or phrase will not be restricted to its immediate antecedent."). We see no indication in Articles 2 and 3 of Chapter 73 that the Legislature uses the words, "ditch" and "water," synonymous-

ly.[2] In fact, in the statutory scheme in which Section 73–3–3 appears, there are indications that the Legislature does not use the terms synonymously.

{19} The ownership of water rights in this State is entirely dependent on the amount of water put to beneficial use. NMSA 1978, § 72–1–2 (1907) ("Beneficial use shall be the basis, the measure and the limit of the right to the use of water ...."). Unlike the ownership of water rights, ditch ownership is based on contribution to the construction of the ditch. "All acequias, public or private, when completed, shall be the property of the persons who may have completed such acequias or ditches ...." NMSA 1978, § 73–2–7 (1882). Thus, the Legislature has clearly recognized the difference between ditch ownership and water rights. In addition, the Legislature has clearly recognized and applied this difference in limiting the class of individuals who may serve as commissioner or mayordomo of a ditch to those owning "an interest in said ditch *or* the water therein." NMSA 1978, § 73–3–1 (1903, as amended 1987) (emphasis added). Thus, we reject the State Engineer's argument that the Legislature's use of the word "ditch" refers to an interest similar in kind to the interest in water.

## C.

{20} In an argument similar to the State Engineer's statutory construction argument, the Wilsons contend that our prior cases indicate that an interest in the ditch is the same as an interest in the water for purposes of Section 73–3–3. Although this Court has addressed the meaning of Section 73–3–3 on several occasions, we disagree with the Wilsons' interpretation of those cases.

{21} The Wilsons primarily rely on a statement by this Court in *State ex rel. Community Ditches v. Tularosa Community Ditch*, 19 N.M. 352, 370, 143 P. 207, 213 (1914), that the "interest in the ditch depends upon the amount of land for which [a person] has acquired a water right, and this right, so acquired ..., is only to the use of a sufficient amount of water to properly irrigate [the] land and for domestic purposes." The Wilsons contend that this statement in *Tularosa* interprets Section 73–3–3 as requiring a single election procedure based on water rights. We disagree.

{22} Notwithstanding the language in *Tularosa* suggesting that ditch interests are concomitant with water rights, the Officers correctly point out that "New Mexico cases have long recognized that ditch rights and water rights are distinct, are derived from different sources, and are governed by different rules of law." *Olson v. H & B Properties, Inc.*, 118 N.M. 495, 498, 882 P.2d 536, 539 (1994). For example, addressing whether community ditch associations acquired water rights under the statutes in *Snow v. Abalos*, 18 N.M. 681, 140 P. 1044 (1914), this Court discussed the relationship between the ownership of ditches and water rights. "The ditch, or carrier system, having been constructed by the joint labors of all the water users, is owned by them as tenants in common; each having a common interest in the same ." *Snow*, 18 N.M. at 695, 140 P. at 1048. "[T]he fact that ... water was diverted into a ditch, owned in common with other water users, did not give such other users any interest in, or control over, the right to take water, or water right ...." *Snow*, 18 N.M. at 695, 140 P. at 1049. Similarly, in *Olson*, this Court highlighted the difference between ditch interests and water rights: "Water rights are derived from appropriation for

---

**2.** The Legislature first enacted Section 73–3–3 as an amendment, limited in application to certain counties, 1903 NM Laws ch. 32, § 12, to the general ditch election procedure originally enacted by 1895 NM Laws, ch. 1, § 3. *See* 1903 NM Laws ch. 32, § 2. The original 1895 election law remains in force, in its amended form, for those counties not subject to Section 73–3–3. *See* NMSA 1978, § 73–2–14 (1895, as amended 1921). Taos County is subject to Section 73–3–3. *See* 1917 NM Laws ch. 68, § 1 (removing Taos

County from the list of counties exempt from the application of the 1903 amendments). Based on the context of its enactment, we believe Section 73–3–3, though now codified in an article separate from many of the general provisions affecting ditch associations, is part of an overall scheme in the regulation of ditch associations. We, therefore, interpret Section 73–3–3 in combination with the provisions of Article 2 of Chapter 73.

beneficial use while ditch rights are derived from ownership of the ditch and an easement therein." *Olson*, 118 N.M. at 498, 882 P.2d at 539.

{23} In the face of such clearly drawn distinctions between water rights and ditch rights, we conclude that the description of ditch interests articulated in *Tularosa* was a characterization of the specific facts in the case and was not intended as a repudiation of the principles articulated in *Snow*.[3] In *Tularosa*, the parties disputed the ownership of water rights by those who owned land outside of a township and, based on this dispute, the Court faced a challenge to the eligibility of particular voters. 19 N.M. at 360–63, 143 P. at 209–11. The parties in *Tularosa* did not distinguish between water rights and ditch interests, and there is no suggestion in the recitation of the facts that the ditch association relied on ditch interests for purposes of election procedures. *See id.* at 356–62, 143 P. at 208–11. We believe the Court in *Tularosa* meant only that ditch interests and water rights were the same *for the parties involved in that case. See id.* at 370, 143 P. at 213. We do not believe the Court intended to collapse the distinction between water rights and ditch rights as a general proposition. To the extent *Tularosa* does so, it has been implicitly rejected by *Olson.* We also do not believe the Court intended to limit the voting method for ditch associations.

{24} In any event, this Court has since reevaluated the meaning of Section 73–3–3. In *Holmberg v. Bradford*, 56 N.M. 401, 402–03, 244 P.2d 785, 786–87 (1952), three landowners sought an injunction to reapportion the shares of ownership in a ditch company in accordance with the proportion of ownership of land irrigated by the community ditch. The Court concluded that ditch ownership and water rights are separate and distinct interests and that, based on the statutory definition of ditch ownership, courts had no power to reapportion ditch ownership based on proportional ownership of irrigable land. *Holmberg*, 56 N.M. at 404–07, 244 P.2d at 788–90. The Court addressed the

argument that a ditch election statute, Section 73–2–14, identical in relevant part to the one at issue in this matter, merged ditch ownership and water rights: "[W]e believe that [Section 73–2–14] merely provides two alternative methods of voting, and it does not destroy any property rights which [Section 73–2–7] recognized." *Holmberg*, 56 N.M. at 405, 244 P.2d at 788. Thus, contrary to the Wilsons' assertion, our prior case law is consistent with our rejection of the limited reading of Section 73–3–3 as requiring voting in proportion to the possession of water rights.

{25} Although we have rejected the Wilsons' argument that voting is limited to proportional water rights, the Wilsons ultimately dispute the Association's ability to conduct voting on a majority basis. Thus, we must analyze whether Section 73–3–3 permits ditch associations to vote based on a majority of those using the ditch.

## IV.

{26} The Officers argue that an interpretation of the statute allowing voting based proportionately on water rights would violate the Equal Protection Clause's mandate of one person, one vote, *see Reynolds v. Sims*, 377 U.S. 533, 577–81, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); U.S. Const. amend. XIV. Assuming the Equal Protection Clause requires majority voting for ditch associations, our construction of the statute as allowing, though not requiring, proportionate voting based on water rights would render the statute facially unconstitutional. Thus, we address this issue in order to determine whether majority voting is required in ditch officer elections pursuant to Section 73–3–3 and in order to inform our construction of the statute with constitutional principles.

{27} In *Reynolds*, the United States Supreme Court determined:

The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative

---

**3.** We think it significant in our interpretation of *Tularosa* that it was decided within six months of *Snow*, that it cited *Snow* for authority, and that the same justice authored both opinions. *Com-*

*pare Snow*, 18 N.M. at 681, 690, 140 P. at 1044, 1047, *with Tularosa*, 19 N.M. at 352, 356, 366, 143 P. at 207, 208, 212.

government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise. 377 U.S. at 555, 84 S.Ct. 1362. The United States Supreme Court further determined that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." *Reynolds*, 377 U.S. at 560–61, 84 S.Ct. 1362. As a result, the Court required that both houses of the Alabama Legislature be apportioned on a population basis, *id.* at 586–87, 84 S.Ct. 1362, and established a general requirement of one person, one vote in the election of state officials. The United States Supreme Court later extended the application of *Reynolds* to the political subdivisions of states. *See Avery v. Midland County*, 390 U.S. 474, 479–80, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

■■■■■ {28} Nevertheless, the Equal Protection Clause's requirement of one person, one vote does not apply to governmental entities created primarily for limited purposes and exercising narrow functions. *Ball v. James*, 451 U.S. 355, 364–68, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 728–30, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). We conclude that the statutes governing acequias are limited in purpose, that ditch associations exercise narrow functions, and that, therefore, ditch officer elections do not fall within the requirement of one person, one vote. "The act [including the original ditch officer election procedure] was purely administrative. It did not confer upon the organization, in its corporate capacity thus created, the power to acquire or hold title to water rights." *Snow*, 18 N.M. at 692, 140 P. at 1047. We believe the Legislature enacted Articles 2 and 3 of Chapter 73 primarily to ensure the distribution of water for irrigation "more conveniently and economically." *Candelaria v. Vallejos*, 13 N.M. 146, 162, 81 P. 589, 595 (1905), *quoted in Snow*, 18 N.M. at 698, 140 P. at 1050. The limited duties of ditch officers, including distribution based on water rights put to beneficial use, reflect this overall purpose. *See* NMSA 1978, § 73–3–4 (1903).

■■■ {29} Due to the limited function of ditch associations controlled by Section 73–3–3, much of the reasoning of *Ball* is particularly apposite. "The constitutionally relevant fact is that all water delivered ... is distributed according to land ownership, and the District does not and cannot control the use to which the landowners who are entitled to the water choose to put it." *Ball*, 451 U.S. at 367–68, 101 S.Ct. 1811 (footnote omitted). We believe that the purposes for which ditch associations were created necessarily involve a "disproportionate relationship ... to the specific class of people whom the system makes eligible to vote." *Ball*, 451 U.S. at 370, 101 S.Ct. 1811. Thus, we conclude that voting for ditch association officers based proportionally on water rights or ditch interests "reasonably reflects the relative risks" and "the benefits and the burdens" of ditch operations. *Ball*, 451 U.S. at 371, 101 S.Ct. 1811; *see* § 73–3–4; NMSA 1978, § 73–3–5 (1903) ("The owners of said community ditches ... shall labor therein in proportion to their lands under cultivation."). We, therefore, conclude that the Legislature was not required by the Equal Protection Clause of the United States Constitution to establish voting for ditch officers on the basis of one person, one vote. *See Lower Valley Water and Sanitation Dist. v. Public Serv. Co. (In re Lower Valley Water and Sanitation Dist.)*, 96 N.M. 532, 537, 632 P.2d 1170, 1175 (1981) ("[S]torage and delivery of water, without a concurrent power to control the use of such water, is not such a central governmental function, even where the entity possesses a nominal public character.").

{30} Nevertheless, because of the importance of the right to vote, we will be extremely cautious in our interpretation of statutes tending to limit that right. *See* NM Const. art. II, §§ 3 (providing the people of this State the right to self-government), 8 (providing for free elections and that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage"); *cf. Reynolds*, 377 U.S. at 561–62, 84 S.Ct. 1362 ("Undoubtedly, the right of

suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."). As the United States Supreme Court has observed, the right to vote would be hollow if not for the general requirement of equal voting. *See Reynolds,* 377 U.S. at 565, 84 S.Ct. 1362 ("Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less."). Indeed, the United States Supreme Court has applied the limited-purpose doctrine as a narrow exception to a general requirement of majority voting.

{31} Therefore, while the Equal Protection Clause does not require equal voting for limited-purpose entities if a rational basis exists for departure from the constitutional norm, we will strictly construe statutes tending to limit the right to vote in favor of equal voting. We will not infer a limitation on the right to equal voting absent clear legislative intent to the contrary. *Cf. Ball,* 451 U.S. at 373, 101 S.Ct. 1811 (Powell, J., concurring) ("[W]e should expect that a legislature elected on the rule of one person, one vote will be vigilant to prevent undue concentration of power in the hands of undemocratic bodies."). Due to the nature of our scheme of government, we presume that the Legislature does not provide for voting based exclusively according to property ownership or wealth. *See Salyer Land Co.,* 410 U.S. at 738, 93 S.Ct. 1224 (Douglas, J., dissenting) ("The weighting of votes according to one's wealth is hostile to our system of government."); *Esler v. Walters,* 56 N.Y.2d 306, 452 N.Y.S.2d 333, 437 N.E.2d 1090, 1095 (1982) (Fuchsberg, J., dissenting) ("[A] cornerstone of democracy is universal suffrage. Antithetical to this belief is a pecuniary or propertied qualification for voting, for it seems obvious that one's influence in government should bear no relation to such a consideration."). In determining whether Section 73-

3-3 permits majority voting, we apply these principles.

## V.

{32} In our analysis of the parties' arguments under Section 73-3-3, we have determined that the Legislature intended to provide for voting based on a proportional interest in water and that the interest in water is defined as the number or amount of water rights. In addition, we have determined that the Legislature intended to provide for voting based on a proportional interest in the ditch. We have also determined that, although the Equal Protection Clause does not require majority voting, the importance of the right to vote necessitates that we strictly construe statutes tending to limit the right to equal voting. Finally, although we have recognized the Legislature's intent to provide for voting based on a proportional interest in the ditch, we have not yet determined the legislative meaning of the phrase "in proportion to the interest of the voter in the ditch."

{33} In *Olson,* we clarified that there can be two interests in a ditch: (1) an ownership interest; and (2) an easement interest. 118 N.M. at 498, 882 P.2d at 539. A ditch is owned, as tenants in common or joint tenants, by the individuals contributing to the construction of the ditch or their successors in interest. Section 73-2-7. Unlike ditch ownership, "[t]he rights of one holding an easement in the land of another are measured by the nature and purpose of the easement." *Olson,* 118 N.M. at 498, 882 P.2d at 539; *see* NMSA 1978, § 73-2-5 (1941) (providing for an easement interest following five years of continuous use of the ditch for purposes of irrigation). An easement interest, then, is substantially dependent on water rights.

{34} We believe the Legislature articulated in Chapter 73 an additional, or third, interest in a ditch. In order to accomplish significant changes to the physical structure of the ditch, the Legislature has required "the consent in writing of a majority of the water users of [the] community ditch."

NMSA 1978, § 73–2–56 (1919). Based on the language in this statute, we now recognize that Chapter 73 includes, as an interest in a ditch, the interest of being a water user and that this interest is separate from the easement and ownership interests in a ditch. The interest in being a water user is an interest held equally by all those with water rights in the ditch.

{35} In providing that ditch officer elections pursuant to Section 73–3–3 may be conducted in proportion to the interest of the voter in the ditch, the Legislature did not specify the type of interest in a ditch a voter must possess. Because we have identified three different interests in a ditch, we conclude that the Legislature's failure to identify the type of interest in the ditch to be used for purposes of ditch officer elections renders the use of the phrase "interest of the voter in the ditch" within Section 73–3–3 ambiguous. *See State v. Elmquist,* 114 N.M. 551, 552, 844 P.2d 131, 132 (Ct.App.1992) ("A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses.").

## A.

{36} "The main goal of statutory construction is to give effect to the intent of the legislature." *Rowell,* 121 N.M. at 114, 908 P.2d at 1382. In order to discern the intent of the Legislature when interpreting an ambiguous statute, we resort to well-accepted rules of statutory construction, always striving to "select the rationale that most likely accomplishes the legislative purpose— or best fills a void not addressed by the Legislature." *State v. Anaya,* 1997–NMSC– 010, ¶ 29, 123 N.M. 14, 933 P.2d 223; *accord State ex rel. Helman v. Gallegos,* 117 N.M. 346, 351–54, 871 P.2d 1352, 1357–60 (1994). "A fundamental rule of statutory construction is that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent." *Roth v. Thompson,* 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992).

{37} The Legislature, in relation to ditch association operations contained in Articles 2 and 3 of Chapter 73, has articulated with specificity five different management schemes distinguishing among the various interests in a ditch system for various purposes: (1) based on the majority of those possessing water rights, Section 73–3–1 (appointing successor commissioners in the event of the joint vacancy of two or more commissioner offices); (2) based on the majority of ditch owners, Section 73–3–2 (establishing, in conjunction with the commissioners and the mayordomo, the rate of compensation for the ditch officers); (3) based on a majority of water users, Section 73–2–56 (consenting to the alteration, change of location, enlargement, extension, or reconstruction of the ditch); (4) based on a majority of the owners of irrigated land, NMSA 1978, § 73–2–18 (1851–52) (determining the compensation for mayordomos); and (5) based in proportion to irrigable land or the lands under cultivation, NMSA 1978, § 73–2–34 (1851–52, as amended 1977) (responsibility for labor on the ditch); NMSA 1978, § 73–2–52 (1921) (taxing labor for the opening of a drainage, tajo or outlet); § 73– 3–5 (responsibility for labor on the ditch). Additionally, the Legislature has referred to ditch interests in several different sections of the relevant acts. *See* §§ 73–2–7, –3–1; NMSA 1978, §§ 73–2–12 (1895, as amended 1987), –2–27 (1895), –2–42 (1973), –3–2 (1903). In every instance save one, *see* § 73–2–42 (requiring both an "interest and water right in the ditch" by a blind person in order to permit the irrigation of not more than three acres free of charge), the Legislature specifically referred to an ownership interest in the ditch.

{38} These statutes indicate to us that the Legislature recognized the different interests at stake in a ditch system and that it was fully capable of clearly and unambiguously limiting the application of a statute to one or even two of those interests. We believe it is significant that the Legislature failed to identify the type of ditch interest relevant in ditch officer elections. We interpret this omission as signaling a legislative intent to recognize each ditch interest, in addition to the interest in water, and, as a result, to provide for multiple alternatives in determining the appropriate voting scheme.

## B.

{39} The State Engineer argues that the phrase "in proportion" appearing in Section 73–3–3 excludes the possibility of majority voting. We disagree. If all voters possess an equal interest in either the ditch or the water, then majority voting and proportionate voting are one and the same. Thus, the Legislature's reference to proportionate voting cannot be understood as excluding the possibility of majority voting. Rather, we review other election statutes in pari materia with Section 73–3–3. Unlike Section 73–3–3, these statutes contain the word "majority." In reviewing these other statutes, we apply our rule of strict construction and presume, in the absence of clear legislative intent to the contrary, that the Legislature intended that "majority" would mean equal voting.

{40} We believe the State Engineer's position overlooks three statutes in pari materia with Section 73–3–3. First, the Legislature has referred specifically to the voting procedure for electing ditch officers as majority-based. As identified above, the Legislature, in Section 73–2–56, established a requirement of "the consent in writing of a majority of the water users of [the] community ditch" in order to accomplish significant enumerated changes to the physical structure of the ditch. Further, the Legislature then compared this majority voting process to Section 73–3–3, and its counterpart, Section 73–2–14, by stating that "such majority [is] to be determined by the same rule as applies to the election of commissioners of the acequia." Section 73–2–56. The language contained in Section 73–2–56 suggests to us that the Legislature included in Section 73–3–3, as an interest in the ditch, the interest, equally held by each household having water rights in the ditch, of being a user of the water in the ditch. As a result, we believe the Legislature included majority voting in Section 73–3–3. We believe that, for both of these statutes, Section 73–2–56 and Section 73–3–3, the Legislature recognized the importance of the subject matter of the law to the entire ditch community and, therefore, permitted majority-based voting.

{41} Second, the Legislature has provided that "a majority of the owners of the water rights" in a ditch appoint successor commissioners in the event of a joint vacancy. Section 73–3–1. We believe it would be anomalous for the Legislature to *require* majority voting for the interim replacement of commissioners and yet *preclude* majority voting in elections pursuant to Section 73–3–3. Thus, we agree with the Attorney General, acting as amicus curiae, that "[t]here is absolutely no indication in the language of the 1895 Act or elsewhere that the legislature intended therein to outlaw majority voting schemes used by various acequias."

{42} Finally, we believe our construction of Section 73–3–3 as allowing flexibility in voting procedures is consistent with the nature of ditch associations as discussed in Articles 2 and 3 of Chapter 73. Although ditch associations subject to Chapter 73 are political subdivisions of this State, *see* NMSA 1978, § 73–2–28 (1965), the Legislature also has directed that "[a]ll community ditches or acequias shall for the purposes of this article be considered as corporations ...." NMSA 1978, § 73–2–11 (1903). Thus, a statutory ditch association is a hybrid between a corporation and a public body. As indicated by our conclusions with respect to the Equal Protection Clause, we believe statutory ditch associations have a nominal public character but "remain essentially business enterprises." *Ball*, 451 U.S. at 368, 101 S.Ct. 1811. We further believe that the Legislature chose to treat ditch associations as corporations for the specific purpose of electing officers, *see* NMSA 1978, § 53–11–33(A) (1983) (providing for voting in corporations based proportionally on shares "except as otherwise provided in the articles of incorporation"), by approving proportionate voting but granting to ditch association members the discretion to select the most appropriate system of voting for each individual ditch.

## C.

{43} Given the statutes in pari materia with Section 73–3–3, we believe that the Legislature intended for each acequia to choose the voting method suitable to its particular needs. *See* § 73–3–3 ("The election ... shall, be held by the outgoing commissioners,

under written rules and regulations to be prescribed by them."). We believe the Legislature, in promulgating Section 73–3–3 and consistent with other legislative enactments concerning acequias, NMSA 1978, § 72–9–2 (1907) (preserving local customs in the distribution of water from ditches), recognized that each ditch system is unique and has individualized needs. Therefore, we determine that Section 73–3–3, strictly construed in favor of equal voting, does not prevent a ditch association from choosing to conduct voting based on a majority vote of the water users in the ditch association. As a result, so long as the voting class is comprised of those having water rights, Section 73–3–3 ("Only those having water rights in the acequia or ditch ... shall be allowed to vote ...."), thereby ensuring a common interest in the flow of water, we conclude that the Legislature intended to provide to each acequia the flexibility to select the most effective voting scheme to achieve the purposes for which the acequia is established in completing the important task of electing ditch officers. Voting in ditch elections may be conducted based proportionately on water rights, based proportionately on ditch ownership, or based on a majority of those using the ditch for the distribution of water.

## VI.

█ {44} Based on our interpretation of Section 73–3–3, we conclude that there are genuine issues of material fact in this case which preclude summary judgment. The parties dispute whether the Association has chosen historically to conduct elections based proportionately on ditch ownership, based proportionately on water rights, or based on one member, one vote. The Wilsons contend that the Association's by-laws require voting in proportion to share ownership. In addition, the Wilsons maintain that the Association has conducted share-based elections since its inception. By contrast, the Officers contend that the Association adhered to a prior practice of one member, one vote in the 1995 election. On remand, the trial court may determine, through the Association's by-laws, its articles of incorporation, and extrinsic evidence, which voting method the Association has chosen to apply and whether the 1995 election complied with this choice. We leave to the district court, should the issue arise, the resolution of the parties' arguments regarding tenancy in common and ownership of the ditch.

{45} Under Section 73–3–3, voting for officers of ditch associations "shall be in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights." In answer to the question certified for interlocutory appeal, we conclude that this statutory language allows alternative methods of voting to be selected by each individual ditch association so long as the voting class is comprised of those possessing water rights in the acequia. There are genuine issues of material fact which must be resolved prior to assessing the Association's compliance with Section 73–3–3. Therefore, we reverse the grant of summary judgment and remand for further proceedings. Because the district court lacks jurisdiction over the 1994 election, we remand only the 1995 election contest to the district court for further proceedings and remand the 1994 election contest for dismissal.

{46} **IT IS SO ORDERED.**

BACA and SERNA, JJ., concur.

ALARID, J., New Mexico Court of Appeals (sitting by designation).