The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **October 31, 2022**

**No. A-1-CA-38176**

**GRANT W. PRICE,**

Petitioner-Appellee,

v.

**NEW MEXICO SOIL AND WATER CONSERVATION COMMISSION, including its Commissioners, DUSTON HUNT a/k/a DUDLEY HUNT, J. STEVEN GLASS, JOSE VARELA-LOPEZ, GABE ESTRADA, JOHN NORRIS, and JOHN SANCHEZ, JR. a/k/a CHARLIE SANCHEZ, JR.,**

Respondents-Appellants.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**James T. Martin, District Judge**

Peter Goodman
Mesilla Park, NM

Michael W. Lilley
Las Cruces, NM

Sanders & Westbrook, PC
Maureen A. Sanders
Albuquerque, NM

for Appellee

Hector H. Balderas, Attorney General
Nicholas M. Sydow, Civil Appellate Chief
Amye Green, Assistant Attorney General
Santa Fe, NM

for Appellants

## OPINION

**YOHALEM, Judge.**

{1}    The question in this appeal is whether the constitutional principle of "one person, one vote"[1] applies to the election of supervisors to a soil and water conservation district's board of supervisors, the governing body of the district. Soil and water conservation districts are governmental entities created by the New Mexico Soil and Water Conservation District Act (the Act), NMSA 1978, Sections 73-20-25 to -48 (1965, as amended through 2019), to encourage the conservation and development of New Mexico's soil, water, and natural resources.

{2}    Petitioner Grant Price filed a petition for writ of mandamus in the district court in 2017 objecting to the adoption of geographic voting zones with significantly unequal population for the election of the Doña Ana County Soil and Water Conservation District's (the District) board of supervisors. Petitioner initially named both the District and the Soil and Water Conservation Commission (the Commission), which had approved the voting map drawn by the District, as

---

[1]The "one person, one vote" requirement arises from the Equal Protection Clause of the United States Constitution. *See Maestas v. Hall*, 2012-NMSC-006, ¶ 1, 274 P.3d 66 ("The idea that every voter must be equal to every other voter when casting a ballot has its genesis in the Equal Protection Clause, U.S. Const. amend. XIV, § 1 (Equal Protection Clause), and is commonly referred to as the 'one person, one vote' doctrine."). Plaintiff relies on both the United States Constitution and the New Mexico Constitution but draws no distinction on the applicable principles of law. We therefore refer solely to the principles of law developed under the United States Constitution.

Respondents. Petitioner complained that the voting zones as drawn violated the United States Constitution's "one person, one vote" requirement, diluting the voting power of Petitioner and the other residents of Zone 4, the zone that includes the City of Las Cruces. The district court agreed, finding that the District's voting zones "impermissibly dilute and diminish the voting rights of Zone 4 residents." The significantly unequal distribution of the population among the voting zones found by the district court resulted, for example, in a single vote cast in Zone 3 having nearly four times the weight of a vote cast in Zone 4.

{3}     Based on these findings of fact, the district court concluded that the Commission's approval of the voting zones was not authorized by the Legislature, was inconsistent with the Commission's statutory duty under Section 73-20-39 of the Act to ensure proper and equitable representation of district voters, and was in violation of the "one person, one vote" mandate of the United States Constitution as well.

{4}     We agree that Section 73-20-39 does not authorize the adoption of geographic voting zones for the election of district supervisors, which deviate from the "one person, one vote" requirement of the Equal Protection Clause. We therefore affirm the district court's grant of a writ of mandamus requiring the Commission to "rescind its approval for the current geographic [electoral] zones within the . . . District."

2

# BACKGROUND

## I. The Soil and Water Conservation District Act

{5}     The Act was enacted by our Legislature in 1965. The Act creates a state Commission charged with overseeing the creation of soil and water conservation districts throughout the state. *See* §§ 73-20-28, -33. The stated purpose of the Act, and the task assigned to the Commission and the districts, is to encourage and help execute "appropriate corrective and conservation practices and programs," § 73-20-26(A)(3), and to "conserve and develop beneficially the soil, water and other natural resources of the state," *id.*, so as to "promote the health and general welfare of the people of the state," § 73-20-26(A)(1). Under the terms of the Act, the districts and the Commission focus on preventing flooding and soil erosion, remediating excess deposits of sediment, as well as on the conservation, beneficial application, and development of water resources.

{6}     The Act provides a process for the creation of districts throughout the state. *See* § 73-20-33 (specifying the process for creating a district and determining the boundaries of that district). Sections 73-20-26(B) and 73-20-44(A) provide that a soil and water conservation district organized under the Act "is a governmental subdivision of the state, a public body politic and corporate," distinct from the Commission. The process of creating a district is initiated by a request to the Commission from a group of at least twenty-five landowners in the proposed district.

3

*See* § 73-20-33(A). The landowners propose geographic boundaries for the new district, which the Commission reviews, and approves or rejects. *Id.* If the district and its boundaries are approved by the Commission, there is a district-wide vote of registered voters residing within the district boundaries. *See* § 73-20-33(A)(4). The creation of the district requires the approval of the majority of those voters. *See* §§ 73-20-33(A)(4)(b),(c), -34. Since 1965, when the Act became law, forty seven soil and water conservation districts have been created.

{7}     The governing body of each district is composed of between five and seven supervisors. *See* § 73-20-37(A). Five are elected in accordance with the Local Election Act, NMSA 1978, § 1-22-1 to -19 (1985, as amended through 2019). *See* § 73-20-37(A). The Commission is allowed to appoint up to two additional supervisors. *See id.* Of the five elected supervisors, four are required to be landowners within the geographical area of the district. *Id.* The fifth supervisor need not meet the landowner qualification. *Id.*

{8}     The Commission is empowered by Section 73-20-39 to adopt rules for the election of the board of supervisors in each district. Of central importance to this case, Section 73-20-39 authorizes the Commission to approve geographic voting zones for the election of supervisors "to ensure proper representation of district voters and to facilitate district functions." Section 73-20-39. Section 73-20-39 also

4

requires the Commission to "provide for the proper and equitable representation for each faction geographically zoned in the district." *Id.*

## II. The Proceedings in the District Court

{9} Petitioner, a voter residing within the District, petitioned the district court for a writ of mandamus requiring the District and the Commission to redraw the geographic voting zones approved by the Commission for the election of District supervisors to conform to the United States Constitution's "one person, one vote" requirement. Petitioner claimed that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that any geographic drawing of zones take population into account "mak[ing] those districts or zones as equal in population as feasible so that all voters within the [District's] jurisdiction are equal."

{10} The district court held an evidentiary hearing on the merits of the petition, taking evidence from both the District and Commission witnesses on the factors they considered in drawing the boundaries of the District's voting zones; the functions and authority exercised by the District, including the District's authority to allocate project funds, to tax, to take political positions, and to engage in government activities; as well as on the number of voters in each of the four voting zones.

{11} The District was divided into voting zones in 2015. Before that, the District voted at-large for the five elected supervisors. In order to obtain approval for its division into geographic voting zones, the District submitted to the Commission a

proposed map showing four voting zones; the registered voters in each zone would elect one supervisor to the governing board of supervisors. The fifth supervisor would be elected at large, by a majority vote of the voters in all four zones. The District witnesses admitted that the voting zone boundaries were drawn solely on the basis of "watershed geography," without regard to the population of each zone, and without any attempt to equalize the number of voters residing in each of the zones.

{12}    The district court found that the District voting zones were substantially unequal in population; specifically, the court found that 17,556 registered voters lived in Zone 1; 19,881 registered voters lived in Zone 2; 14,869 registered voters lived in Zone 3; and 62,784 voters lived in Zone 4, where Petitioner resides. Based on these figures, approximately 52,306 registered voters were collectively entitled to elect three supervisors to the District's governing board, while the remaining 62,784 voters (a majority of voters in the District) were entitled to elect only one supervisor. In other words, the vote of a registered voter in the electoral zone with the least population, Zone 3, carried more than four times the weight of a vote cast in Zone 4.[2]

---

[2]The district court also found that the District's board of supervisors took political positions, claiming to represent the views of the majority of voters living within the District, and that the board of supervisors voted on a state-wide land use plan, and allocated money between the respective zones for conservation and development.

6

{13} The district court found that "the citizens of Zone 4 [where Petitioner resides] are not equitably represented." Concluding that the Commission's actions "violated the 'one person, one vote' constitutional mandate, as well as [the Commission's] statutory duty to ensure proper and equitable representation for voters," the district court issued a writ of mandamus directing the Commission to "redraw the zone boundaries in the . . . District to more equitably reflect the 'one person, one vote' constitutional mandate."

{14} When the Commission argued at rehearing that it lacked the statutory authority to redraw the voting zones without a District proposal, the district court modified the writ to require the Commission to withdraw its approval of the District voting zones, thereby returning the District to at-large voting where each vote would count equally.[3]

**DISCUSSION**

{15} The Commission does not deny that the District's voting zones do not contain "as nearly . . . equal population as is practicable," *see Maestas*, 2012-NMSC-006, ¶ 1, or that Petitioner's vote and the votes of others who happen to reside in Zone 4

---

[3]We note that the writ does not preclude the District from drawing, and the Commission from approving geographic electoral zones, so long as those zones contain "as nearly . . . equal population as is practicable," in conformance with the Equal Protection Clause. *Maestas*, 2012-NMSC-006, ¶ 1 (internal quotation marks and citation omitted).

are significantly diluted solely because of the location of their residence. The Commission instead asserts that Section 73-20-39 of the Act authorizes the Commission to approve voting zones drawn based solely on geographic features, without regard to population, and that such a departure from the norm of equal voting is constitutional because the districts are "governmental entities created primarily for limited purposes," *Wilson v. Denver*, 1998-NMSC-016, ¶ 28, 125 N.M. 308, 961 P.2d. 153, a narrow exception to the "one person, one vote" requirement recognized by both the United States Supreme Court and our Supreme Court. *Id.*; *see also Ball v. James*, 451 U.S. 355, 364-68 (1981) (same).

{16}    Petitioner responds by pointing out that the exception to the "one person, one vote" requirement for limited-purpose entities applies only if our Legislature has clearly provided that equal voting is not required. Our Supreme Court in *Wilson* provides the analysis this Court applies when a government entity uses a voting system that departs from the "one person, one vote" requirement. 1998-NMSC-016, ¶ 31 (internal quotation marks and citation omitted). Consistent with Petitioner's argument, *Wilson* holds that a departure from the "one person, one vote" requirement is permissible only when (1) the Legislature, by statute, has clearly stated its intent to authorize such a departure, and (2) the legislative authorization is in compliance with the Constitution. *See id.*

{17} We agree with Petitioner that Section 73-20-39 does not authorize a departure from the principle of "one person, one vote" in electing district supervisors. Although the Commission has focused in its appellate briefing almost entirely on whether a deviation from the "one person, one vote" requirement would be constitutional if authorized by our Legislature, we do not reach that question. We construe Section 73-20-39 to require that any geographic voting zone boundaries for the election of district supervisors comply with the "one person, one vote" constitutional requirement.

## I. The Relevant Principles of Statutory Construction

{18} The interpretation of a statute is an issue of law that is subject to de novo review by our appellate courts. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. Our goal in construing a statute is to "ascertain and give effect to the intent of the Legislature." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted).

{19} "In construing a statute, we look first to the plain language of the statute as the primary indicator of legislative intent, and we construe the words of a statute according to their ordinary meaning absent evidence of legislative intent to the contrary." *Wilson*, 1998-NMSC-016, ¶ 16 (internal quotation marks and citation omitted). We exercise caution, however, about applying a rigid, literal reading of statutory language, aware that such a reading can easily result in a misunderstanding

9

of legislative policy and intent. *See Smith*, 2004-NMSC-032, ¶ 9. We do not read statutes in a vacuum: in ascertaining legislative intent, we must read all provisions of a statute together, and with other statutes in pari materia, presuming that the Legislature acted with full knowledge of relevant statutory and common law. *See Baker v. Hedstrom*, 2013-NMSC-043, ¶ 26, 309 P.3d 1047.

{20} Moreover, in cases where the statute at issue implicates the "one person, one vote" requirement, we are directed by our Supreme Court to "strictly construe statutes tending to limit the right to vote in favor of equal voting." *Wilson*, 1998-NMSC-016, ¶¶ 30-31. "We will not infer a limitation on the right to equal voting absent clear legislative intent to the contrary." *Id.*

**II.  Section 73-20-39 Does Not Express Clear Legislative Intent to Limit the Right to Equal Voting**

{21} We begin our analysis "by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (internal quotation marks and citation omitted). Section 73-20-39 of the Act states, in relevant part, as follows:

> In adopting and publishing rules for the election of supervisors and the registration of district voters, the commission may, to ensure proper representation of district voters and to facilitate district functions, provide for the geographic zoning of a district. The commission shall provide for the proper and equitable representation for each faction geographically zoned in the district.

10

{22} The Commission relies on the Legislature's grant of authority to the Commission, in the first sentence of the section: "to provide for the geographic zoning of a district." *Id.* This language, the Commission argues, "giv[es the Commission] the flexibility to zone based on geography, not population."

{23} We do not agree. When the words used by the Legislature are read in context and given their ordinary meaning, they support the construction advanced by Petitioner, not the Commission's construction. *See* NMSA 1978, § 12-2A-2 (1997) ("Unless a word or phrase is defined in the statute or rule being construed, its meaning is determined by its context, the rules of grammar and common usage."). Applying these principles, we note that, in the very sentence giving the Commission authority to approve geographic zoning of a district, the Legislature states the purposes that must guide the Commission's use of this authority—"to ensure proper representation of district voters and to facilitate district functions." Section 73-20-39. Neither purpose stands alone. "Proper representation of district voters" is the first requirement. *Id.*

{24} The Legislature's focus on "proper representation of district voters" in the section governing elections is consistent with the Legislature's statement of purpose at the outset of the Act. *Id.* The Act's statement of purpose focuses on protecting and using the state's natural resources to promote the health and welfare of all citizens. It envisions a benefit and an interest shared by all citizens, not just a small group of

11

landowners. Section 73-20-26(A)(1) and (3) state, that the purpose of the Act is to encourage "appropriate corrective and conservation practices and programs," and to "conserve and develop beneficially the soil, water and other natural resources of the state," so as to "promote the health and general welfare of the people of the state." *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352 ("[I]t is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute.).

{25}     Even if some district functions or projects are based on the geography of a particular area, the Legislature has addressed that by allowing the creation of geographic voting zones. The Commission fails to present any reason justifying their construction of the phrase "proper representation of district voters" to place watershed boundaries above assigning equal weight to each vote. Section 73-20-39. The Legislature has emphasized the requirement that any drawing of geographic voting zones also ensure "proper representation of district voters" by repeating in the following sentence of Section 73-20-39 the requirement that there be both "proper and equitable representation." *Id.*

{26}     We note that many voting systems authorized by our Legislature, including our system for electing state legislators, rely on geographic districting, while at the same time requiring those districts to be drawn so as to protect the principle of "one person, one vote." Our Legislature must be presumed to have been aware of these

other statutes that take both geography and population into account. *Baker*, 2013-NMSC-043, ¶ 26 (presuming "that the Legislature acted with full knowledge of relevant statutory and common law" (alteration, internal quotation marks, and citation omitted)).

{27} We fail to see in Section 73-20-39 the plain language that is required to overcome the presumption that the Legislature intends to provide for equal voting, absent clear legislative intent to the contrary. *Wilson*, 1998-NMSC-016, ¶ 31. "[W]e should expect that a [L]egislature elected on the rule of one person, one vote will be vigilant to prevent undue concentration of power in the hands of undemocratic bodies." *Ball*, 451 U.S. at 373 (Powell, J., concurring).

{28} We do not find merit in the Commission's argument that had the Legislature intended to require the districts to divide the population among the geographic zones to ensure each vote would have equal or nearly equal weight, it could easily have said so. Although this may be true, our responsibility is to carefully assess the words actually used by the Legislature. *See Perea v. Baca*, 1980-NMSC-079, ¶ 22, 94 N.M. 624, 614 P.2d 54 ("A statute must be read and given effect as it is written by the Legislature[.]" (internal quotation marks and citation omitted)). And, in this case, to the extent there is any lack of clarity in the statutory language, we follow the directive of our Supreme Court to "strictly construe statutes tending to limit the right to vote in favor of equal voting." *Wilson*, 1998-NMSC-016, ¶ 31.

13

{29} In sum, we do not construe Section 73-20-39 as revealing the clear legislative intent necessary to justify departure from the "one person, one vote" requirement. We therefore agree with the district court that the Commission exceeded its statutory authority under Section 73-20-39, and therefore also violated the Equal Protection Clause by approving the unequal voting zones at issue in this case.[4]

**CONCLUSION**

{30} We conclude that the district court appropriately granted a writ of mandamus ordering the Commission to withdraw its approval of the District's voting zones because the inequality in population of the zones conflicts with both Section 73-20-39, and with the Equal Protection Clause of the United States Constitution.

{31} **IT IS SO ORDERED.**

 

_____

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

_____

**J. MILES HANISEE, Chief Judge**

_____

**SHAMMARA H. HENDERSON, Judge**

---

[4]Because we resolve this appeal on the ground that our Legislature has required compliance with the "one person, one vote" requirement of the Equal Protection Clause, we do not reach the parties' hypothetical dispute about whether it would have been constitutional for the Legislature to have adopted or allowed the districts and Commission to adopt an unequal voting scheme.

14